**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MARK G. CHAREST, | ) | |
| | ) | |
| Plaintiff, | ) | ECF CASE |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:13-cv-11556 |
| PRESIDENTS AND FELLOWS OF | ) | |
| HARVARD COLLEGE | ) | |
| AND ANDREW G. MYERS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff Dr. Mark G. Charest files this Complaint against

Defendants and alleges the following:

**Nature of Action**

1.     Dr. Charest alleges breach of contract, fraud, indirect fraud,

tortious interference with contract, unjust enrichment, declaratory judgment of

no contract because of lack of consideration, breach of fiduciary duty,

promissory estoppel and violations of M.G.L. c. 93A §§ 9 and 11.

**Parties**

2.     Plaintiff Dr. Mark G. Charest ("Dr. Charest") is a resident of 180A

Palo Alto Ave., Palo Alto, CA 94301.

3.     On information and belief, Defendant Presidents and Fellows of Harvard College ("Harvard University") is a not-for-profit corporation organized under the laws of the Commonwealth of Massachusetts, having a principal place of business in Cambridge, Massachusetts.

4.     On information and belief, Defendant Andrew G. Myers is a professor at Harvard University with a principal place of business at 12 Oxford Street Cambridge, MA 02138 and a residence at 41 Braddock Park, #2 Boston, MA 02116.

## Jurisdiction and Venue

5.     This Court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1332 because Dr. Charest is a resident of California and none of the Defendants are organized or are residents of California, and because the value of the matter in controversy exceeds $75,000.

6.     This Court has authority to order declaratory relief under 28 U.S.C. §§ 2201 and 2202 because there is a live controversy between Plaintiff and Defendants that includes a dispute over whether there is valid contract between Dr. Charest and Harvard to assign certain patent rights.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events on which this action is based occurred in the District of Massachusetts.

## Background

**A.      Dr. Charest's Discovery of a New Class of Tetracycline Antibiotics**

      i.      <u>Dr. Myers Recruited Dr. Charest to Attend Harvard University to Work on Finding a Synthetic Route for Making Tetracycline Antibiotics.</u>

8.      In 1998, Dr. Andrew Myers met with Dr. Charest and discussed enrolling as a graduate student in Harvard's organic chemistry department.

9.      Dr. Myers and Dr. Charest discussed a long-standing problem in organic chemistry: how to synthetically create new tetracycline antibiotics.

10.      This was a problem that Dr. Myers had attempted to solve.

11.      Prior to 1998, Dr. Myers had been unable to create a route for making new synthetic tetracycline antibiotics.

12.      Dr. Myers suggested that Dr. Charest work on his PhD at Harvard.

13.      Dr. Myers suggested that Dr. Charest work in his lab and try to synthetically create tetracycline antibiotics.

14.      Dr. Charest began his doctoral work at Harvard in 1999.

15.      Dr. Myers advised and mentored Dr. Charest during his studies.

16.      During his research, Dr. Charest investigated ways to synthetically make tetracycline antibiotics.

17.      In fact, Dr. Charest directed almost all of his research efforts to discovering the first synthetic route of production for a new class of novel tetracycline antibiotics.

18.     Based on his research, Harvard awarded Dr. Charest a PhD in Organic Chemistry in 2004.

ii.   <u>Dr. Charest Discovered a Groundbreaking Synthetic Route for Creating a New of Class of Tetracycline Antibiotics.</u>

19.     In 2004, in conjunction with others in his lab, Dr. Charest discovered a method to synthetically make a new class of tetracycline antibiotics.

20.     More specifically, Dr. Charest and his colleagues discovered an elegant method of taking an intermediary and, in as little as three steps, using that intermediary to make a new class of tetracycline antibiotics.

21.     This new class of tetracycline antibiotics was particularly important because it had the potential to treat antibiotic-resistant bacteria.

22.     Harvard and its faculty immediately recognized the importance of Dr. Charest's pioneering work.

23.     Before any of the information regarding the discovery became public, including publication of Dr. Charest's thesis, Harvard began work on patenting Dr. Charest's discovery.

24.     Dr. Charest worked with Harvard's patent counsel, Dr. C. Hunter Baker, to draft a patent application.

25.     After filing a patent application, the group published its groundbreaking work in the April 2005 edition of *Science* under the title "A Convergent Enantioselective Route to Structurally Diverse 6-Deoxytetracycline Antibiotics."

26.     The article described the synthetic route for creating a new class of tetracycline antibiotics that formed the basis of Dr. Charest's PhD thesis.

27.     Dr. Charest was the first listed author on the article.

28.     Dr. Charest was listed as the first author because his contributions to the discovery were greatest in comparison to the other authors.

**B.      Dr. Charest's Lack of Consideration for the Assignment of His Inventorship Rights in the Tetracycline Patents**

29.     In and around 2004-05, Harvard filed a series of patent applications that covered Dr. Charest's work in developing new synthetically created tetracycline antibiotics (the "Pioneering Tetracycline Patents").

30.     In 2005, Dr. Charest signed documents assigning his patent rights to his tetracycline discovery to Harvard (the "Tetracycline Assignments").

31.     In return for signing the Tetracycline Assignments, Harvard either did not give Dr. Charest anything of value or in the alternative agreed to abide by its policy for distributing royalties amongst inventors (the "IP Policy").

**C.      Harvard's Office of Technology Development's Use of a Sham Patent to Defraud Dr. Charest Out of Royalties**

        i.      The Office of Technology Development That Oversaw Harvard's Intellectual Property Efforts Was Created to Make a Profit for Harvard and to Protect the Interests of it Faculty.

32.     On information and belief, one of Harvard's motivations for creating the Office of Technology Development ("OTD") was to profit from inventions made by people affiliated with Harvard.

33.     On information and belief, OTD often works with faculty and investors to create companies to commercialize new technology.

34.     On information and belief, OTD then works with the companies to license the intellectual property so that Harvard and its Professors receive royalties from any future sales of the licensed technology.

35.     On information and belief, Harvard keeps 65% of all royalties collected from these licenses; the other 35% of the royalties goes to the inventors (the "Inventor Royalties").

36.     On information and belief, another of Harvard's purposes in creating OTD was to protect the interests of the faculty.

37.     OTD's stated priority is to "protect[] faculty interests while advancing discoveries toward commercial development."

38.     And its mission is to "foster a spirit of innovation and entrepreneurship among the faculty, harness the power of Harvard's substantive intellectual property, and advance the development of new discoveries made by the faculty for the good of society."

39.     On information and belief, OTD is not tasked with protecting the interests of current or former students.

    ii.    <u>Based on the Value of the Pioneering Tetracycline Patents,
OTD raised $25 million to form Tetraphase Pharmaceuticals.</u>

40.    On information and belief, in 2005, OTD and Dr. Myers began speaking with investors and analyzing the potential market for new tetracycline antibiotics.

41.    On information and belief, OTD and Dr. Myers created Tetraphase to commercialize the technology claimed in the Pioneering Tetracycline Patents.

42.    On information and belief, in creating Tetraphase, Dr. Myers became the scientific founder and a senior advisor for Tetraphase and received stock options and other valuable consideration.

43.    On information and belief, OTD and Dr. Myers raised $25 million from investors to create Tetraphase.

44.    On information and belief, in addition to investing $25 million, the investors understood that Tetraphase would pay Harvard milestone payments and a royalty on any future sales of tetracycline drugs.

45.    On information and belief, when created, Tetraphase's only assets were the Pioneering Tetracycline Patents.

46.    The Pioneering Tetracycline Patents were incredibly valuable and independent investors recognized it and paid for the right to commercialize them.

47.    Without the Pioneering Tetracycline Patents, OTD and Dr. Myers could not have created Tetraphase.

     iii.    <u>OTD and Dr. Myers Allocated an Outsized Portion of the Inventor Royalties to Dr. Myers Without Consulting the Non-Faculty Inventors Because They Wanted to Enrich Dr. Myers at the Expense of the Non-Faculty Inventors.</u>

48.    Harvard's policy is that inventors share the Inventor Royalties equally.

49.    Harvard's IP Policy states that OTD cannot on its own allocate shares of Inventor Royalties disproportionately.

50.    The only way to deviate from an equal share is for the inventors themselves to award a disproportionate share of royalties to fellow inventors.

51.    On August 8, 2006, Dr. Erik Halvorsen, then Director of Business Development for OTD, emailed Dr. Charest and the other non-faculty inventors.

52.    In that email, Dr. Halvorsen disclosed to the non-faculty inventors for the first time that Harvard had worked with a number of investment groups to create Tetraphase.

53.    Dr. Halvorsen also explained that instead of the standard equal distribution amongst inventors, Dr. Myers would receive 50%, Dr. Charest 15%, Dr. Seigel 15%, Dr. Lerner 15%, and Dr. Brubaker 5%.

54.    Dr. Halvorsen's first email to the non-faculty inventors cutting their royalties included an agreement for them to sign.

55.    It stated that "[w]e acknowledge that the Harvard University Royalty Sharing Policy for Intellectual Property specifies that, for inventions, the creators' share normally will be divided equally among all creators unless they agree otherwise."

56.     The non-faculty inventors were to receive nothing in return for agreeing to cut their royalties for the benefit of Dr. Myers.

57.     If any of the non-faculty inventors had refused to sign the agreement, all of the inventors would have received an equal 20% share of the Inventor Royalties.

58.     After the email from Dr. Halvorsen, Dr. Charest tried to discuss the distribution of Inventor Royalties.

59.     After discussing the distribution with all the inventors other than Dr. Myers, the other contributors agreed to adjust the shares so that Dr. Charest received 18.75%, Dr. Seigel 11.25%, Dr. Lerner 10%, and Dr. Brubaker 10%.

60.     Dr. Myers would not take part in that discussion and Dr. Halvorsen made clear that Dr. Myers 50% share was not open to discussion.

61.     Dr. Halvorsen said that he arrived at this distribution after reviewing the patents and the work done by the various contributors.

62.     On information and belief, Dr. Myers had no lab notebooks describing his relative contributions.

63.     On information and belief, Dr. Halvorsen consulted Dr. Myers when he created this distribution.

64.     On information and belief, Dr. Myers requested a 50% share of the Inventor Royalties.

    iv.    <u>OTD and Dr. Myers Used Threats and Fraudulent Tactics to Force Dr. Charest to Agree to a Lower Inventor Royalty Share.</u>

65.    Dr. Charest spoke to Dr. Myers and expressed his opposition to the Inventor Royalty distribution.

66.    Dr. Myers told Dr. Charest to "tread lightly" and "be careful."

67.    Dr. Myers told Dr. Charest "to think about [his] career."

68.    Dr. Charest understood these statements to be threats and took them seriously.

69.    Dr. Charest sent an email to Dr. Halvorsen, stating, "[d]uring the course of my correspondence I have received verbal warnings to 'be careful' and 'tread lightly'."

70.    On information and belief, later when Dr. Charest applied for a job in a venture capital firm, Dr. Myers refused to act as a reference.

71.    On information and belief, despite several calls from Dr. Charest's potential employer for a reference, Dr. Myers never returned their calls.

72.    Meanwhile, during their negotiations, Dr. Halvorsen threatened to further cut Dr. Charest's royalties.

73.    In an attempt to force him to accept less than an equal distribution, Dr. Halvorsen warned Dr. Charest that if he did not accept OTD's proposed distribution, OTD would cut his share to 10%.

74.    Dr. Halvorsen threatened that he would award all the inventors an equal 20% share, but that he would allocate 50% of the Inventor Royalties to a

wholly separate, undisclosed patent application on which Dr. Charest was not an inventor (the "undisclosed patent application").

76. Dr. Charest understood Dr. Halvorsen to be threatening him; he wrote to Dr. Halvorsen that "[i]n your previous email you issued the written warning that my portion of the inventor allocation would be reduced if I proceed forward."

76. Dr. Halvorsen used this separate, undisclosed patent application to force Dr. Charest to take OTD's offer.

77. The undisclosed patent application, however, was, on information and belief, filed after financial terms were agreed to between Harvard and Tetraphase and added to the license between Harvard and Tetraphase just prior to finalization of their license agreement.

78. Dr. Charest only later learned that this separate, undisclosed patent application was only a ruse to force Dr. Charest to sign OTD's offer.

> v.   Dr. Charest Acquiesced to OTD's Threats Because He Did Not Know the Truth About the Sham Patent.

79. Dr. Halvorsen argued that the undisclosed patent application warranted half of the Inventor Royalties.

80. Although Dr. Charest requested that Dr. Halvorsen show him the undisclosed patent application, Dr. Halvorsen refused to show it to Dr. Charest.

81. Dr. Charest wanted to see the undisclosed patent application to determine the veracity of Dr. Halvorsen's threat.

82.     But even after Dr. Charest offered to sign a non-disclosure agreement, Dr. Halvorsen refused to show him the undisclosed patent application.

83.     Because Dr. Charest could not examine the undisclosed patent application, and because Dr. Havorsen's threatened to cut his royalty share to 10%, Dr. Charest agreed to OTD's proposed distribution.

84.     However, Dr. Charest has only recently realized that the undisclosed patent application that Dr. Halvorsen used to force him to agree to an 18.75% royalty share was a sham.

85.     On information and belief, in the seven years since that application was filed, it has never published; Harvard has actually or effectively abandoned it.

86.     Based on this new information, Dr. Charest now believes that the undisclosed patent application—a patent application that was filed after financial terms were agreed to between Harvard and Tetraphase and added to the license just prior to finalization—was included solely to act as leverage over Dr. Charest and the other non-faculty inventors.

87.     On information and belief, it was included to ensure that Dr. Myers received at least 50% of the Inventor Royalties.

88.     If Dr. Charest had known the truth about the undisclosed patent application, he would never have agreed to a reduction in his share of the Inventor Royalties.

89.     On information and belief, if Dr. Halvorsen had not misrepresented the value of the undisclosed patent application, Dr. Myers would have received 20% of the Inventor Royalties, not 50%, and the non-faculty inventors would have each received 20% of the Inventor Royalties.

**D.     OTD's Second Attempt to Fraudulently Allocate Royalties Amongst the Inventors**

i.     OTD Tried to Cut Dr. Charest's Share of the Inventor Royalties Again, This Time By Allocating an Additional 33% of the Tetraphase Royalties to Yet Another Patent.

90.     On November 24, 2009, Dr. Laura Brass, the then new Director of Business Development for OTD, wrote to Dr. Charest that on January 31, 2007, Harvard and Tetraphase amended their license to include a second new patent application.

91.     Dr. Brass explained that because Tetraphase used the technology in the new patent application, OTD was retroactively assigning 33% of the value of the Tetraphase License to the new patent application.

92.     The scope of the new patent application was very limited compared to Dr. Charest's pioneering work.

93.     The Pioneering Tetracycline Patents claimed new tetracycline antibiotic compounds, methods of use, methods for making them, an intermediary used in making the new tetracyclines, and methods for making the intermediary.

94.     The newly added patent application (the "Intermediary Method Patent") disclosed an additional method for making the intermediary already described and created in the Pioneering Tetracycline Patents.

95.     One difference between the Pioneering Tetracycline Patents and the Intermediary Method Patent was who was listed as an inventor.

96.     The Pioneering Tetracycline Patents had five inventors, four of them being non-faculty inventors.

97.     The Intermediary Method Patent had two inventors, Dr. Myers and his graduate student Dr. Brubaker.

98.     Dr. Charest repeatedly asked for the allocation of the Inventor Royalties between Drs. Myers and Brubaker; Dr. Brass refused to tell him.

99.     On information and belief, Dr. Myer's received more than 50% of the Inventor Royalties for the Intermediary Method Patent.

100.    On information and belief, Dr. Myers's share of the Inventor Royalties for Intermediary Method Patent was higher than his share of the Inventor Royalties for the Pioneering Tetracycline Patents and Dr. Myers benefited from a shift of royalties to the Intermediate Method Patent.

    ii.     <u>Harvard's IP Policy Requires That When Multiple Patents Are Licensed, Inventor Royalties Be Allocated According to the Patents' Commercial Value.</u>

101.    Unlike distribution of royalties amongst inventors of the same patent, which is presumed to be equal, distribution of royalties amongst different patents is governed by the commercial value of the patents to the license.

102.    Harvard's IP Policy states that upon request, OTD shall allocate the royalties according to the commercial value of the patents to the package.

103.    The IP Policy also states that the value assigned by the contract shall control.

104.    If an inventor disagrees with OTD's decision, he can appeal the decision.

105.    Harvard's Committee on Intellectual Property (the "IP Committee") hears all appeals and is tasked with ruling in accordance with Harvard's IP Policy.

       iii.    <u>The Intermediary Method Patent Had Little Commercial Value.</u>

106.    On information and belief, the Intermediary Method Patent had no instructional value because the methods were included in a public doctoral thesis.

107.    On information and belief, the methods disclosed in the Intermediary Method Patent formed the basis of Dr. Brubaker's PhD thesis.

108.    On information and belief, regardless of whether Harvard filed a patent on the methods, they were going to be public.

109.    On information and belief, the Intermediary Method Patent did not teach Tetraphase anything that was not going to be in the public domain.

110.    If Tetraphase had not licensed the Intermediary Method Patent, Harvard could not have stopped Tetraphase from using the claimed method because Tetraphase's research efforts were exempted from the patent laws.

111.    When a company is performing research or conducting trials for the submission of a New Drug Application to the Federal Drug Administration, they are exempted from the patent laws. (See 35 U.S.C. § 271(e)(1).)

112.    On information and belief, all of Tetraphase's work on tetracyclines was directed to FDA approval and was therefore exempted from the patent laws.

113.    On information and belief, Tetraphase could have used the methods claimed in the Intermediary Method Patent regardless of whether they had a license from Harvard.

114.    On information and belief, the Intermediary Method Patent also had little value in stopping future competitors from copying Tetraphase's tetracycline antibiotics.

115.    The FDA only allows companies to list patents that cover compounds or methods of use for litigation purposes in the so-called Orange Book.

116.    On information and belief, if a patent cannot be listed in the Orange Book, it has limited value to a Pharmaceutical company because companies cannot use unlisted patents to stop generic companies from getting FDA approval for their drugs.

117.    On information and belief, Tetraphase cannot list the Intermediary Method Patent in the Orange Book.

118.    On information and belief, the Intermediary Method Patent had and still has almost no commercial value to Tetraphase.

iv.    Tetraphase and Harvard's Actions Show That The Intermediary Method Patent Had Little Commercial Value.

119.    On information and belief, Tetraphase was built around the Pioneering Tetracycline Patents.

120.    On information and belief, when Harvard started Tetraphase, they convinced investors to invest $25 million.

121.    On information and belief, Harvard represented to investors that the company could make tetracyclines for research and clinical trials.

122.    On information and belief, the Intermediate Method Patent was not discussed or included in the Tetraphase License because it did not exist.

123.    On information and belief, when the Intermediate Method Patent was filed, Harvard agreed it provided little new value.

124.    The Tetraphase License allowed Harvard to object to the inclusion of the Intermediary Method Patent in the original license on the grounds that it created new value for the license.

125.    In other words, if Harvard believed the Intermediary Method Patent was novel when it issued and added value in addition to the Pioneering

Tetracycline Patents, it was incumbent upon Harvard to object and renegotiate the license.

126.    On information and belief, Harvard made no such objection.

127.    On information and belief, Harvard made no attempt to renegotiate the license based on the inclusion of the Intermediary Method Patent in the license.

128.    On information and belief, because it did not object or attempt to renegotiate, Harvard agreed that the Intermediary Method Patent provided little new value.

129.    On information and belief, the only thing Harvard received for the Intermediate Method Patent was $25,000.

130.    On information and belief, when compared to the $250,000 as an up front payment, the milestone payments, the equity stake in Tetraphase, and the substantial royalty on future sales of Tetraphase's drug products that Harvard received as value for the Pioneering Tetracycline Patents, the money received for the Intermediate Method Patent is at best nominal.

131.    On information and belief, because of the Intermediary Method Patent's limited commercial value, Harvard received almost nothing in comparison to what it received for the Pioneering Tetracycline Patents.

132.    On information and belief, the Intermediary Method Patent has little value to Tetraphase.

v.     OTD Knew That the Intermediary Method Patent Had Little
       Commercial Value.

133.   When Dr. Charest received Dr. Brass's November 2009 letter he immediately understood that the allocation did not represent the commercial value of the patents.

134.   By that time, Dr. Charest was working in venture capital, putting together the very types of licenses at issue.

135.   He knew that in pharmaceutical companies like Tetraphase, the only patents that had any value were the ones that covered the commercial product.

136.   The Pioneering Tetracycline Patents were the only patents that covered the commercial product and could block a competitor from selling a competing drug product.

137.   Dr. Charest repeatedly tried to discuss the relative commercial value of the patents but OTD refused.

138.   Dr. Brass explained that patents that are licensed together usually share royalties equally.

139.   But the Pioneering Tetracycline Patents and the Intermediary Method Patent were not licensed together.

140.   As further support, she stated that all of the other inventors agreed with the distribution.

141.    And she explained that Tetraphase used the Intermediary Method Patent without explaining why the patent, *i.e.* the right to exclude others from practicing the invention, had value to Tetraphase.

142.    Dr. Brass's explanation of the distribution of the Inventor Royalties had nothing to do with commercial value and was in violation of Harvard's IP Policy.

143.    On information and belief, Dr. Brass would not explain the commercial value of the Intermediary Method Patent because OTD knew it had little value.

144.    On information and belief, the fact that OTD waited almost three years after adding the Intermediary Method Patent to the Tetraphase License to reallocate royalties is evidence that they knew it had little commercial value.

145.    On information and belief, at the time Tetraphase added the Intermediary Method Patent to the license they were not using the method.

146.    On information and belief, OTD did not try to assign value to the Intermediary Method Patent at the time it was added because their only argument for value—use—did not exist.

147.    On information and belief, OTD waited almost three years to add the patents so they could make their only possible argument for reallocating royalties—an argument based on perceived utility of the science not the commercial value of the patent.

148.    On information and belief, the argument that the Intermediary Method Patent solved a problem for Tetraphase is also wrong.

149.    On information and belief, Tetraphase was created based on its perceived ability to create and sell tetracycline antibiotics.

150.    On information and belief, the fact that sophisticated investors invested $25 million, prior to the existence of the Intermediary Method Patent, shows that independent parties did not view the production of the intermediary as a barrier to creating sufficient amounts of tetracycline antibiotics.

### E.    OTD's Fraud Before the IP Committee

#### i.    OTD's Attempt to Force Dr. Charest To Drop His Challenge to Their Decision Shows That OTD Is Not Independent.

151.    After Dr. Charest told OTD of his intention to challenge their royalty reallocation, they used the possibility of further reduction in his share to coerce him into dropping his challenge.

152.    OTD told Dr. Charest that if he proceeded with his appeal, they would submit supporting information from Tetraphase to the IP Committee and he could risk having the committee reduce his royalty by 50% instead of the 33% stated in Dr. Brass's November 2009 letter.

153.    On information and belief, OTD included this information in an attempt to get Dr. Charest to drop his appeal.

154.    On information and belief, OTD attempted to get Dr. Charest to drop his appeal because they knew their argument was flawed and wanted to foreclose Dr. Charest's attempt to later challenge the distribution.

ii.    <u>Dr. Baker Assisted OTD in Supporting Its Fraudulent Analysis.</u>

155.    OTD asked Dr. Baker, their patent attorney, to "determine how the payments from Tetraphase should be distributed among the two patent families filed by Harvard."

156.    On information and belief, OTD did not ask Dr. Baker to determine the commercial value of the patents.

157.    On information and belief, Dr. Baker did not use the commercial value of the patents to allocate royalties.

158.    Instead, Dr. Baker's analysis relied on the "importance of the second generation synthesis" to support his conclusion, without defining how that relates to their commercial value.

159.    Dr. Baker's analysis consisted of four sentences.

160.    OTD's reliance on Dr. Baker's sparse analysis shows that they were using Dr. Baker's advice as cover to support their improper distribution.

161.    On information and belief, before OTD created Tetraphase and licensed the Pioneering Tetracycline Patents, OTD did an extensive investigation of the potential market for tetracycline antibiotics, how potential competition

would affect the profits of the company, and how the Pioneering Tetracycline Patents could protect the market from competition.

162.    On information and belief, OTD used that information to value the Pioneering Tetracycline Patents and "negotiate a fair and reasonable licensing agreement."

163.    On information and belief, OTD did not rely, nor could they in good conscience have relied, on a four-sentence analysis from Dr. Baker to determine the value of Pioneering Tetracycline Patents.

164.    On information and belief, OTD used Dr. Baker's analysis to support its reallocation of royalties to the Intermediary Method Patent.

165.    On information and belief, Dr. Baker knew that what OTD was asking of him was to support a shift of royalties, not provide good faith advice.

166.    On information and belief, Dr. Baker is a patent attorney at the law firm of Wolf, Greenfield & Sacks, P.C.

167.    On information and belief, Wolf Greenfield has a twelve person Licensing and Transactional Group; Dr. Baker is not a member of the group.

168.    On information and belief, if Dr. Baker wanted to give accurate advice about the value of the patents to the license or believed that is what OTD wanted, he would have referred OTD to a member of the licensing group.

169.    On information and belief, Dr. Baker knew Dr. Myers very well; they both studied under the same advisor at Harvard.

170.    On information and belief, Dr. Baker was financially dependent on Dr. Myers and OTD; he relied upon them for a lot of his patent work.

171.    On information and belief, Dr. Baker had conversations with Dr. Myers about this distribution.

172.    On information and belief, Dr. Baker felt compelled to support OTD's distribution because of his long-standing ties to Harvard and Dr. Myers.

173.    On information and belief, yet even when giving providing his analysis to OTD, Dr. Baker felt compelled to qualify his answer.

174.    Dr. Baker stated that that Tetraphase was using the method in the Intermediary Method Patent, but noted they were completing the "synthesis with slightly different reagents."

175.    Even with respect to use, not value, the Intermediary Method Patent was suspect and so is Dr. Baker's opinion.

        iii.    <u>Tetraphase Assisted Dr. Myers to Shift Royalties to the Intermediary Method Patent.</u>

176.    On information and belief, when Dr. Charest challenged OTD, they sought further ways to bolster their arguments.

177.    On information and belief, they went to the company Dr. Myers co-founded and for which he acted as senior scientific advisor: Tetraphase.

178.    On information and belief, they approached Dr. Plamondon, the senior vice president of chemistry.

179.    On information and belief, as a chemist at Tetraphase, Dr. Plamondon worked closely with Dr. Myers and talked to him about this issue.

180.    On information and belief, Dr. Myers and OTD asked Dr. Plamondon to support their allocation of Inventor Royalties.

181.    On information and belief, Dr. Plamondon's opinion shows that he was trying to support OTD's findings, not provide accurate information.

182.    In his letter to OTD, Dr. Plamondon carefully worded his letter to assign maximum value to the Intermediary Method Patent.

183.    Dr. Plamondon stated that "[i]f I were to offer a relative weighting of the two patent families' values in light of the respective demonstrated utility to Tetraphase, I would assign 50% to [the Pioneering Method Patents] and 50% to [the Intermediary Method Patent]."

184.    On information and belief, Dr. Plamondon carefully crafted and qualified his answer to support a conclusion that the Intermediary Method Patent had value to Tetraphase while avoiding the fact that it had little commercial value.

185.    On information and belief, Dr. Plamondon made this statement on Dr. Myers's and OTD's behalf to support their attempt to support the shift of Inventor Royalties to the Intermediary Method Patent.

**F.    The IP Committee's Violation of Harvard's IP Policy.**

    i.    The IP Committee Was Made Up of Dr. Myers's Fellow Science Professors.

186.    After Dr. Charest requested an appeal of OTD's decision, Harvard assembled an IP Committee.

187.    The IP Committee was created specifically to hear Dr. Charest's appeal of OTD's decision to reallocate royalties to his detriment.

188.    Dr. Fenerjian, the head of technology transfer at OTD, was tasked with managing the appeal the process.

189.    The IP Policy required that the patent allocation be based on the commercial value of the patents.

190.    None of the committee members were business or law professors.

191.    Instead, the committee consisted of four of Dr. Myers's fellow Harvard Science Professors.

192.    On information and belief, those members could one day be in the same position as Dr. Myers: trying to collect royalties for an extremely valuable invention at the expense of their graduate student.

193.    On information and belief, these professors were selected because they were most likely to support OTD's findings.

ii.    OTD Made Sure the IP Committee Heard From Them But Not From Dr. Charest.

194.    On information and belief, OTD made sure their appeal arguments were front and center before the committee and buried Dr. Charest's arguments.

195.    The Memorandum, in essence the appeal brief, submitted to the IP Committee by OTD only discussed their arguments.

196.    In that brief, OTD explained why they believed their distribution was correct based on Tetraphase's use of the methods and compounds claimed

and argued that the fact that all of the other inventors agreed with them except Dr. Charest was evidence OTD's allocation was correct.

197.   OTD included a summary chart with their Memorandum.

198.   It showed the inventors for each patent, and which inventors had rejected the proposed distribution.

199.   On information and belief, OTD's table summarized exactly what they viewed as the important facts: who was going to get paid and who should get punished for rocking the boat.

200.   On information and belief, OTD purposefully buried Dr. Charest's submission, attaching it as an exhibit between a letter and two large patent applications.

201.   Dr. Charest offered to fly to Boston and meet with the committee to explain why he appealed OTD's decision and to present his arguments.

202.   OTD and the committee held the hearing without informing him.

203.   On information and belief, OTD prevented Dr. Charest from attending the appeal to make sure he could not explain his case.

204.   Two members of OTD attended the hearing: Isaac Kohlberg and Dr. Maryanne Fenerjian.

205.   They were the only non-committee members present and they discussed the merits of the case with the committee.

206.   Dr. Charest only found out the committee held the hearing because OTD wrote to tell him that the committee found against him and that they had

reallocated 45% of the Inventor Royalties to the Intermediary Method Patent, further decreasing Dr. Charest's share of the Inventor Royalties.

     iii.    <u>The IP Committee Violated Harvard's IP Policy When It Reallocated 45% of the Inventor Royalties to the Intermediary Method Patent.</u>

207.    On information and belief, the IP Committee did not discuss Dr. Charest's submissions or positions.

208.    On information and belief, the committee did not review Dr. Charest's submissions.

209.    On information and belief, the IP Committee did not discuss the commercial value of the patents.

210.    The IP Committee discussed their findings in their Meeting Minutes.

211.    The one paragraph discussion in the Minutes recognizes "the significant commercial value of composition of matter patent claims, " such as those of the Pioneering Tetracycline Patents.

212.    In analyzing the Intermediary Method Patent, the IP Committee only found that the methods described in that patent had an "enabling role" in producing relevant tetracyclines.

213.    The Committee made no finding that the Intermediary Method Patent had any commercial value.

214.     The IP Committee violated Harvard's IP Policy because they did not award royalties based on the relative commercial value of the patents.

**G.     Demand Under M.G.L. c. 93A § 9, the Consumer Protection Act**

215.     On May 28, 2013, Dr. Charest sent Defendants a demand letter pursuant to M.G.L. c. 93A § 9, the Consumer Protection Act (the "Demand Letter").

216.     The Demand Letter was sent by email and by Overnight Express Mail through the United States Postal Service on May 28, 2013.

217.     In his Demand Letter, Dr. Charest identified himself, described the acts Defendants committed and how those acts harmed him, identified the relief sought, and offered Defendants the opportunity to make a reasonable settlement offer.

218.     Thirty days later, on June 27, 2013, Defendants sent a responsive letter to Dr. Charest.

219.     Defendants did not offer any settlement in their June 27 letter.

220.     Instead, Defendants demanded a release of all claims against them before they would release the $50,261.72 in royalties already accrued and due to Dr. Charest under Harvard's own analysis (10.31% of the Inventor Royalties).

221.     Harvard has improperly withheld all royalty payments from Dr. Charest since March 1, 2011 when he refused to acknowledge the legitimacy of the IP Committee's decision to reduce his share of the Inventor Royalties.

**First Claim for Relief**
**(Breach of Contract)**

222.    The allegations in paragraphs 1- 221 are incorporated into this claim for relief.

223.    Harvard reduced Dr. Charest's share of Inventor Royalties by 45% when it reallocated 45% of the Inventor Royalties to the Intermediary Method Patent.

224.    Harvard contracted to abide by its IP Policy when Dr. Charest signed the Tetracycline Assignments.

225.    Harvard's IP Policy requires that Royalties for different patents be split in accordance with how the license values the patents or by their commercial value.

226.    This reallocation of royalties to the Intermediary Method Patent violated Harvard's IP Policy because it did not follow the license valuation or the commercial value of the patents to the licensee.

227.    Harvard breached the contract by not meeting its obligations under its IP Policy.

**Second Claim for Relief**
**(Fraud—Original Distribution of Royalties)**

228.    The allegations in paragraphs 1- 227 are incorporated into this claim for relief.

229.    On September 13, 2006, Dr. Halvorsen represented to Dr. Charest that there was an undisclosed patent that warranted an equal share of the Inventor Royalties because of its commercial value to the license agreement.

230.    Dr. Halvorsen told Dr. Charest that if he did not accept OTD's offer of 18.75% of the Inventor Royalties he would allocate half of the Inventor Royalties to the undisclosed patent, effectively cutting Dr. Charest's share of the Inventor Royalties to 10%.

231.    On information and belief, Dr. Halvorsen conspired with Dr. Myers to file the undisclosed patent with the intention of using it to force Dr. Charest to accept a reduced share of the Inventor Royalties.

232.    On information and belief, Dr. Halvorsen knew that the unidentified patent had little value and that it would have been improper for OTD to attribute any royalty payments to that patent.

233.    On information and belief, Drs. Halvorsen and Myers intended to deceive Dr. Charest regarding the undisclosed patent's commercial value in order to force him to agree to agree to a lower reduced share of the royalty payments.

234.    Dr. Charest relied upon Dr. Halvorsen's representation that the undisclosed patent had significant commercial value.

235.    If Dr. Charest had known the truth about the commercial value of the undisclosed patent, he would have not agreed to a reduced share of the royalty payments and his share would have been 20% of the Inventor Royalties

instead of 18.75%, and Dr. Myers would have received 20% of the Inventor

Royalties instead of 50%.

236.    Dr. Myers and OTD committed fraud by misrepresenting the

undisclosed patent application.

### Third Claim for Relief
### (Indirect Fraud—Reallocation of Royalties)

237.    The allegations in paragraphs 1- 236 are incorporated into this

claim for relief.

238.    On information and belief, Dr. Myers stood to gain financially from

a shift in the royalties from the Pioneering Tetracycline Patents to the

Intermediary Method Patent.

239.    On information and belief, representatives from OTD and Dr.

Myers discussed the allocations of royalties between the Pioneering Tetracycline

Patents and the Intermediate Method Patent with Drs. Plamondon and Baker.

240.    On information and belief, OTD submitted information to the IP

Committee that they knew was false and did not represent the commercial value

of the patents in order to support their shift of royalties to the Intermediary

Method Patent.

241.    On information and belief, the IP Committee relied upon that

information submitted by OTD.

242.    Because of the misrepresentations OTD made to the IP Committee,

Dr. Charest's share of the Inventor Royalties was reduced by 45%.

243.    Dr. Meyers and OTD committed indirect fraud when they worked together to misrepresent the value of the Intermediary Method Patent to the IP Committee.

**Fourth Claim for Relief**
**(Tortious Interference with Contract)**

244.    The allegations in paragraphs 1- 243 are incorporated into this claim for relief.

245.    On information and belief, Dr. Charest and Harvard University had a contractual agreement on the distribution of Inventor Royalties.

246.    On information and belief, Dr. Myers discussed shifting royalties to the Intermediary Method Patent with Dr. Plamondon and members of OTD.

247.    On information and belief, Dr. Myers worked with members of OTD, Dr. Baker, and Dr. Plamondon to submit information to the IP Committee in order to induce Harvard to breach its obligations under the contract.

248.    On information and belief, the IP Committee relied upon that information in reallocating royalties to the Intermediary Method Patent in violation of the contract.

249.    Dr. Myers tortuously interfered with the contract between Harvard and Dr. Charest when he misrepresented the value of the Intermediate Method Patent.

**Fifth Claim for Relief**
**(Unjust Enrichment)**

250.     The allegations in paragraphs 1- 249 are incorporated into this claim for relief.

251.     Dr. Myers received an increased share of the Inventor Royalties because of his actions.

252.     Dr. Charest received a decreased share of the Inventor Royalties because of Dr. Myers's actions.

253.     On information and belief, Dr. Myers worked with OTD and used inequitable actions to cause this shift in Inventor Royalties.

254.     Dr. Meyers's actions unjustly enriched him to the detriment to Dr. Charest.

**Sixth Claim for Relief**
**(Declaratory Judgment of No Contract Because of Lack Consideration)**

255.     The allegations in paragraphs 1- 254 are incorporated into this claim for relief.

256.     Dr. Charest assigned his rights in the Pioneering Tetracycline Patents to Harvard.

257.     If Harvard did not have an obligation to abide by its IP Policy, it did not give Dr. Charest any consideration for executing these assignments and they are therefore void.

## Seventh Claim for Relief
### (Breach of Fiduciary Duty)

258.    The allegations in paragraphs 1- 257 are incorporated into this claim for relief.

259.    Dr. Myers was Dr. Charest's PhD advisor.

260.    Dr. Myers advised Dr. Charest and headed the lab in which he worked on the research that led to the Pioneering Tetracycline Patents.

261.    Dr. Myers had a fiduciary duty to Dr. Charest.

262.    Dr. Myers breached his fiduciary duty to Dr. Charest by using his position as a fiduciary to secure more royalties for himself to the detriment of Dr. Charest.

## Eighth Claim for Relief
### (Promissory Estoppel)

263.    The allegations in paragraphs 1- 262 are incorporated into this claim for relief.

264.    Harvard promised to abide by its IP Policy when Dr. Charest signed the Tetracycline Assignments.

265.    That promise induced Dr. Charest to sign the Tetracycline Assignments.

266.    Harvard did not abide by its IP Policy when allocating Dr. Charest's Inventor Royalties.

267.    Injustice can be avoided only through forcing Harvard to abide by its promise to adhere to its IP Policy or by voiding the Tetracycline Assignments.

## Ninth Claim for Relief
## (Violation of M.G.L. c. 93A § 9)

268.    The allegations in paragraphs 1- 267 are incorporated into this claim for relief.

269.    Defendants used unfair or deceptive acts or practices in the conduct of trade or commerce in order to reduce his share of the Inventor Royalties.

270.    Dr. Charest was harmed because his share of the Inventor Royalties was reduced because of Defendants' conduct.

271.    Defendants violated of M.G.L. c. 93A § 9.

## Tenth Claim for Relief
## (Violation of M.G.L. c. 93A § 11)

272.    The allegations in paragraphs 1- 271 are incorporated into this claim for relief.

273.    Defendants used unfair or deceptive acts or practices in the conduct of trade and commerce in order to reduce his share of the Inventor Royalties.

274.    Dr. Charest was harmed because his share of the Inventor Royalties was reduced because of Defendants' conduct.

275.    Defendants violated of M.G.L. c. 93A § 11.

## Prayer for Relief

**Wherefore**, Plaintiff respectfully requests the following relief:

A.    Rescission of the Tetracycline Assignments;

B.      Declaratory judgment that the Tetracycline Assignments are invalid for lack of consideration;

C.      Rescission of the Pioneering Tetracycline Patents royalty rate agreement;

D.      An increase in Dr. Charest's share of the Inventor Royalties from 10.31% to at least 20%;

E.      Monetary damages equal to 9.7% of the Inventor Royalties on at least $500 million in yearly sales for the years 2016 to at least 2025, discounted at a reasonable interest rate;

F.      Disgorgement of any benefits Dr. Myers received from the above actions;

G.      Punitive damages;

H.      Treble damages;

I.      Attorney's fees.


Respectfully submitted,

   /s/ Brian D. O'Reilly

Brian D. O'Reilly (655402)
O'REILLY IP PLLC
10 Jay Street
Suite 416
Brooklyn, NY 11201
Tel: (212) 390-0096
Fax: (212) 390-8684
Email: brian@oreillyip.com

Dated: June 28, 2013