UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| | ) | |
| MARK G. CHAREST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No.: 13-cv-11556-DPW |
| | ) | |
| PRESIDENT AND FELLOWS OF | ) | |
| HARVARD COLLEGE and ANDREW G. | ) | |
| MYERS, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Michael J. Tuteur (BBO #543780)
Geoffrey M. Raux (BBO #674788)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel:  (617) 342-4000
Fax: (617) 342-4001
*mtuteur@foley.com*
*graux@foley.com*

*ATTORNEYS FOR DEFENDANTS*
*PRESIDENT AND FELLOWS OF HARVARD*
*COLLEGE AND DR. ANDREW G. MYERS*

i

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 4

ARGUMENT ............................................................................................................................... 7

    I.      Legal Standard ........................................................................................................ 7

    II.     Declaring the Patent Assignment Void Would Ignore the Consideration
           Received by Plaintiff as a Graduate Student, and Would Undermine the Bayh-
           Dole Regime ........................................................................................................... 8

    III.    Harvard's Internal IP Policy is Not a Contract ................................................... 11

    IV.    The Statute of Limitations Bars All Claims Concerning the Allocation of
           Royalties Under the Pioneering Tetracycline Patents ......................................... 12

    V.     Plaintiff's Conclusory Allegations Concerning the IP Committee's Allocation
           Decision Should be Rejected, and All Claims Related Thereto Should be
           Dismissed .............................................................................................................. 13

    VI.    Plaintiff Does Not Have Standing to Assert a Claim for "Indirect Fraud" .................... 15

    VII.   Plaintiff Did Not Have a Fiduciary Relationship With Dr. Myers ................................ 17

    VIII.  Plaintiff is Not a Consumer for Purposes of G.L. c. 93A, § 9, and Neither G.L. c.
           93A, § 9 Not § 11 are Applicable to the Intra-Enterprise Disputes Plaintiff
           Alleges ................................................................................................................... 18

    IX.    The Complaint Should Be Dismissed With Prejudice .................................................. 19

RELIEF REQUESTED ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................15

*Battenfield v. Harvard Univ.,*
    No. 91-5089-F, 1993 Mass. Super. LEXIS 253 (Aug. 31, 1993)...........................17

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.,*
    131 S. Ct. 2188 (2011).......................................................................................10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).......................................................................................7, 15

*Blue Cross Blue Shield of Mass. v. AstraZeneca Pharm.,*
    582 F.3d 156 (1st Cir. 2009).............................................................................18

*Britton v. Athenahealth, Inc.,*
    No. 2012-02457, 2013 Mass. Super. LEXIS 47 (May 3, 2013)............................12

*Butler v. Deutsche Bank Trust,*
    No. 12-10337-DPW, 2012 U.S. Dist. LEXIS 114196 (D. Mass. Aug. 14, 2012)..............7, 11

*Cambridge Literary Props., Ltd. v. W. Goebel Porzellenfabrik G.m.b.H. & Co. Kg.,*
    448 F. Supp. 2d 244 (D. Mass. 2006)................................................................13

*Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.,*
    357 Mass. 40 (1970) ..........................................................................................9

*Hendricks v. Clemson Univ.,*
    353 S.C. 449 (2003)..........................................................................................17

*In re iBasis, Inc. Deriv. Litig.,*
    532 F. Supp. 214 (2007) .....................................................................................7

*Jackson v. Action for Boston Cmty. Dev., Inc.,*
    403 Mass. 8 (1988) ......................................................................................11, 12

*Katz v. Pershing, LLC,*
    806 F. Supp. 2d 452 (D. Mass. 2011)................................................................15

*Knott v. Racicot,*
    442 Mass. 314 (2004) .........................................................................................9

*Linkage Corp. v. Trustees of Boston Univ.*,
   425 Mass. 1 (1996) ...........................................................................................18

*Manning v. Zuckerman*,
   388 Mass. 8 (1983) ...........................................................................................19

*Newton v. Moffie*,
   13 Mass. App. Ct. 462 (1982).............................................................................19

*Nortel Networks, Inc. v. Foundry Networks, Inc.*,
   2004 U.S. Dist. LEXIS 31544 (D. Mass. Jul. 29, 2004)......................................9

*Nortel Networks, Inc. v. Foundry Networks, Inc.*,
   No. 01-CV-10442-DPW, 2003 U.S. Dist. LEXIS 28064 (D. Mass. Mar. 24, 2003) ...............9

*Oum v. Wells Fargo, N.A.*,
   842 F. Supp. 2d 407 (D. Mass. 2012) .................................................................15

*Payne-Barahona v. Gonzales*,
   474 F.3d 1 (1st Cir. 2007)...................................................................................16

*Powers v. Ohio*,
   499 U.S. 400 (1991)............................................................................................16

*Riseman v. Orion Research Inc.*,
   394 Mass. 311 (1985) .........................................................................................19

*Ryan v. Univ. of N.C. Hosps.*,
   No. COA04-16, 2005 N.C. App. LEXIS 402 (Mar. 1, 2005)..............................17

*Shapiro v. Butterfield*,
   921 S.W.2d 649 (Mo. App. 1996) .......................................................................17

*Singleton v. Wulff*,
   428 U.S. 106 (1976)............................................................................................16

*Soto–Torres v. Fraticelli*,
   654 F.3d 153 (2011) ..............................................................................................7

*Szalla v. Locke*,
   421 Mass. 448 (1995) .........................................................................................18

*Warth v. Seldin*,
   422 U.S. 490 (1975)............................................................................................16

*Zimmerman v. Bogoff*,
   402 Mass. 650 (1988) .........................................................................................18

*Zurich Am. Ins. Co. v. Watts Regulator Co.*,
   796 F. Supp. 2d 240 (D. Mass 2011)....................................................................8

**Statutes**

35 U.S.C. §§ 200, *et seq.* ............................................................................................1, 9, 10

G.L. c. 93A ........................................................................................................4, 13, 18, 19

G.L. c. 260 ........................................................................................................................13

**Regulations and Rules**

37 C.F.R. §§ 401.3, 401.14(a) ..........................................................................................9

Fed. R. Civ. P. 12(b)(1) ...................................................................................................15

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ..........................................................................1, 15

Fed. R. Civ. P. 12(b)(6) ...................................................................................................15

**Other Authorities**

NIH Grants Policy Statement (December 1, 2003) ..........................................................10

RESTATEMENT (SECOND) OF CONTRACTS § 87 ..................................................................9

Defendants President and Fellows of Harvard College ("Harvard") and Dr. Andrew G.

Myers submit this Memorandum of Law in support of their Motion to Dismiss the Complaint of Dr.

Mark G. Charest pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## INTRODUCTION

Plaintiff, a former graduate student in Harvard's chemistry department, had access to

Harvard's academic resources, conducted federally-funded research in a Harvard laboratory, studied

under renowned Harvard faculty, including Dr. Myers, received a PhD, and otherwise enjoyed the

benefits afforded to a graduate student at a leading academic research institution.  Along with others

in Dr. Myers's laboratory, Plaintiff's research contributed to the filing of the so-called "Pioneering

Tetracycline Patents" in late 2004.  On August 15, 2005, Plaintiff assigned his entire right, title and

interest in those Patents to Harvard (the "Assignment").  Thereafter, any legal right to or associated

with the Patents (including any right to funds generated thereby) belonged to Harvard, not Plaintiff.

Now, almost eight years later, Plaintiff seeks to invalidate the Assignment for a purported

lack of consideration.  The Assignment itself, however, states on its face that good and valuable

consideration was provided to Plaintiff.  This included the opportunity for Plaintiff to perform

federally-sponsored research at Harvard.  Indeed, in accordance with the framework instituted by

the Bayh-Dole Act, 35 U.S.C. §§ 200, *et seq.*, relevant federal regulations, and applicable policies

of federal agencies supporting scientific research, universities engaged in federally-funded research

*must* obtain assignments of any intellectual property created by their personnel.  This is part of the

arrangement with graduate students and university faculty across the country, and Harvard is no

exception.  To declare that consideration is absent in these circumstances would not simply void

Plaintiff's Assignment here, but would fundamentally undermine the entire Bayh-Dole regime.

Implicitly recognizing that this lack of consideration argument is without merit, Plaintiff

argues in the alternative that if the Assignment was valid, it somehow serves to transform Harvard's

internal policy regarding intellectual property (the "IP Policy") into a binding contract between Plaintiff and Harvard.  Thus, most of the counts set forth in the Complaint are premised on the notion that Plaintiff has a legal or contractual right stemming from the IP Policy.  He does not.  The IP Policy is an internal academic policy, not a contract.  Harvard can unilaterally modify, amend, and rescind it.  It was not negotiated with Plaintiff, and Plaintiff had no hand in its drafting.  Like all other Harvard personnel, Plaintiff was obliged to abide by the Policy, but his assent to the Policy or its particular terms was not required for it to take effect.  All of Plaintiff's claims resting on the false premise that he has enforceable rights in the IP Policy must, therefore, be dismissed.

Separate and apart from Plaintiff's lack of enforceable rights in the IP Policy, this case must be dismissed because he has otherwise failed to state a claim upon which relief can be granted.  Plaintiff's multiple causes of action concern two general instances of alleged misconduct.  The first involves the royalty allocation among the inventors of the Pioneering Tetracycline Patents.  Because Plaintiff assigned all rights in those Patents to Harvard, he has no legally cognizable basis to challenge that allocation.  Nevertheless, Plaintiff complains that the royalty allocation – *to which he expressly assented* – was unfair.  This is not so.  But even if Plaintiff could somehow demonstrate that the allocation was unfair, he still would have no legal means of redress because the allocation and the alleged misconduct surrounding it occurred in *2006* — more than six years before this case was filed.  Any claims arising out of this alleged unfair allocation, therefore, whether sounding in contract, tort, or equity, are barred by the statute of limitations, and must be dismissed.

The second instance of alleged misconduct concerns the royalty allocation between two respective families of patents licensed by Harvard under a single license agreement: the Pioneering Tetracycline Patents and the so-called Intermediary Method Patent.  Harvard's Office of Technology Development ("OTD") made an initial determination that, based on their relative value, the Pioneering Tetracycline Patents should receive 66% of all royalties, while the Intermediary

2

Method Patent would be allocated only 33%.  Plaintiff, who had no involvement with the

Intermediary Method Patent, believed the allocation to the Pioneering Tetracycline Patents was too

low.  He, therefore, availed himself of the procedures under Harvard's IP Policy to file a formal

appeal.  The appeal was heard by a faculty IP Committee, convened by Harvard's Provost.  The

Committee disagreed with Plaintiff, and, after review, determined that the allocation to the

Pioneering Tetracycline Patents was actually too high, reducing it from 66% to 55%.

Displeased with the Committee's decision, Plaintiff now asserts a grand conspiracy theory:

that the IP Committee was duped into reducing the allocation to the Pioneering Tetracycline Patents

to benefit Dr. Myers.  Plaintiff makes the conclusory allegation that Dr. Myers's allocation on the

Intermediary Method Patent was greater than his allocation on the Pioneering Tetracycline Patents

(which was 50%).  Plaintiff further alleges that OTD, outside patent counsel, and executives at the

pharmaceutical company which licensed the patents, all committed fraud on the IP Committee so

that the Committee's decision would benefit Dr. Myers by re-allocating royalties from the

Pioneering Tetracycline Patents to the Intermediary Method Patent.

The problem for Plaintiff's conspiracy theory, constructed solely "on information and

belief," is that it is devoid of any *actual* information and supportable belief.  Indeed, in order for the

reallocation to benefit Dr. Myers, he would need to have greater than a 50% share of the royalties

on the Intermediary Method Patent.  This is the cornerstone of Plaintiff's theory.  But Plaintiff

admits that he does not know the actual allocation between Dr. Myers and the other inventor on the

Intermediary Method Patent.  According to the IP Policy, the presumption is that each inventor is to

receive an equal share in royalties.  With only two inventors on the Intermediary Method Patent, the

presumption is that Dr. Myers would have a 50% share, not more.  If Dr. Myers does have only a

50% share – which, in fact, he does – then no matter what the decision of the IP Committee

regarding the allocation between the two Patent families, Dr. Myers would fare the same because he

would always receive 50% of the total.  Because Plaintiff's contrary allegations must be rejected as conclusory, his entire conspiracy crumbles, and all claims based upon it must be dismissed.

Finally, several of Plaintiff's claims must be dismissed for additional reasons.  Plaintiff does not have standing to assert a claim for "indirect fraud" purportedly committed on a third party (the IP Committee).  Dismissal of Plaintiff's fiduciary duty claim is also required, as there is no basis to find that Plaintiff can unilaterally transform his former academic relationship with Dr. Myers into a fiduciary relationship.   Plaintiff's G.L. c. 93A claims must also be dismissed: Plaintiff is not a consumer for purposes of G.L. c. 93A, § 9, and, his claims, under both G.L. c. 93A, § 9 and § 11, concern intra-enterprise disputes that render c. 93A inapplicable.

For all of these reasons, Plaintiff's Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### *Plaintiff Becomes a PhD Candidate at Harvard*

According to the Complaint, Plaintiff began his doctoral work at Harvard in 1999.  Compl. ¶ 14.  Prior to that time, Dr. Myers – Plaintiff's laboratory advisor – had been developing a means to synthetically create new tetracycline antibiotics.  *Id.* ¶¶ 9-11, 15.  Plaintiff focused his research at Harvard in this area.  *Id.* ¶ 16.  Plaintiff was advised and mentored by Dr. Myers during his studies at Harvard, but directed most of his own day-to-day work.  *Id.* ¶¶ 15-17.  Plaintiff was awarded a PhD from Harvard in Organic Chemistry in 2004.  *Id.* ¶ 24.

### *The Pioneering Tetracycline Patents are Developed and Licensed*

Prior to receiving his PhD, Plaintiff, "in conjunction with others," helped to develop a method for making a new class of tetracycline antibiotics. *Id.* ¶¶ 19-21.  Harvard filed patent applications covering this development in 2004 and 2005.  *Id.* ¶ 29.  A copy of what Plaintiff

designates the "Pioneering Tetracycline Patents" are attached hereto as **<u>Exhibit A</u>**.[1]  On August 15, 2005, Plaintiff assigned all of his right, title and interest to those Patents to Harvard.  Compl. ¶ 30. A copy of the Assignment is attached hereto as **<u>Exhibit B</u>**.

Subsequently, Harvard licensed the Patents to Tetraphase Pharmaceuticals, Inc. ("Tetraphase")—a pharmaceutical company that planned to commercialize the tetracycline developments.  Compl. ¶¶ 40-47.  Under the license agreement, Harvard, as licensor, is entitled to receive royalty payments from Tetraphase in the course of the Patents' commercialization.  *Id.*

*Harvard Shares Royalties With Plaintiff*

Harvard's practice is to share royalties received from patents it licenses with the faculty and students who meet the legal standard of inventorship with respect to those patents.  See *id*. at ¶ 48. This practice is reflected in Harvard's internal "Statement of Policy in Regard to Intellectual Property" (the "IP Policy").  *Id.*  Copies of the IP Policy are attached hereto as **<u>Exhibits C - F</u>**.[2]

Pursuant to the IP Policy, inventors of a patent will be granted an equal share in royalties unless they agree to a different allocation.  *See* Ex. C, App. A § 6(b); Ex. D, § 6(b); Ex. E, § 5(E)(1); Ex. F, § 5(E)(1); Compl. ¶ 55.  With respect to the Pioneering Tetracycline Patents, five inventors were named, including Dr. Myers and Plaintiff.  Compl. ¶¶ 53, 96.  By express agreement of all inventors, ***including Plaintiff***, the allocation was: 50% to Dr. Myers, 18.75% to Plaintiff, and 11.25%, 10%, and 10%, respectively, to the remaining three inventors.  *Id.* ¶¶ 59, 83.  This allocation was determined in the Autumn of 2006.  *See id.* ¶¶ 48-89.

---

[1] In connection with their Motion to Dismiss, Defendants have filed a Request for Judicial Notice setting forth the basis on which this Court should take judicial notice of the Exhibits attached to this Memorandum.

[2] Exhibit C is the 1998 version of the Policy; Exhibit D is the 2001 amendment concerning royalty allocation; Exhibit E is the February 2008 version of the Policy; and Exhibit F is the October 2010 version of the Policy.  Exhibits C and D are relevant to Plaintiff's allegations concerning the individual inventor royalty allocation under the Pioneering Tetracycline Patents and Intermediary Method Patent, which took place in or about 2006 and 2007 respectively. Compl. ¶¶ 48-90.  Exhibits E and F concern Plaintiff's allegations concerning the royalty allocation between the two Patent families and his appeal of the same, which took place between 2009 – 2011.  *Id.* at ¶¶ 90-214.

### *The Intermediary Method Patent is Developed and Licensed*

After Plaintiff's departure from Harvard, research in connection with tetracycline antibiotics continued in Dr. Myers's laboratory, leading to the so-called "Intermediary Method Patent." *See id.* ¶¶ 94-97.  Only two inventors were named on that Patent — Dr. Myers and Dr. Jason Brubaker (a former graduate student of Dr. Myers).  *Id.* ¶ 97.  Pursuant to the IP Policy, the presumptive allocation of royalties between these two inventors was 50-50.  *See supra* 5.

Harvard also licensed the Intermediary Method Patent to Tetraphase — leading to the amendment of the parties' original license agreement.  Compl. ¶ 90.  Harvard's OTD made an initial determination regarding the allocation of royalties between the two families of patents, allocating 66.66% of all royalties received under the amended license agreement to the Pioneering Tetracycline Patents, and 33.33% to the Intermediary Method Patent.  *Id.* ¶ 91.  This allocation was based on OTD's initial determination of the "relative value" of the two patent families.  *See* Ex. E, § 5(E)(3); Ex. F,  § 5(E)(3).

### *Plaintiff Appeals OTD's Allocation Decision*

In cases involving a royalty allocation between different patents licensed as a "package," Harvard's IP Policy provides for an appeal of OTD's determination to a "University Committee on Intellectual Property."  *Id.* at § 5(F).  Under the IP Policy, this "IP Committee" makes the "final determination" as to any allocation.  *Id.* at §§ 5(F), 6(A).

Upon learning of OTD's allocation in this case, Plaintiff appealed.  Compl. ¶¶ 151, 186. Harvard therefore assembled an IP Committee comprised of four distinguished members of Harvard's faculty.  *See id.* ¶¶ 186-191.  Submissions were made to the Committee, including an opinion from Harvard's outside patent counsel, Dr. Hunter Baker; an opinion from Tetraphase, submitted by its senior vice president of chemistry, Dr. Louis Plamondon; and a cover letter and written presentation from Plaintiff.  *See id.* ¶¶ 155-159, 177-183, 200.

*The IP Committee Hears Plaintiff's Appeal and Issues a Final Allocation*

The IP Committee met in January 2011. Its final determination of the appropriate allocation between the two patent families was 55% to the Pioneering Tetracycline Patents and 45% to the Intermediary Method Patent. *Id.* ¶ 206. Plaintiff was informed of the Committee's determination shortly thereafter. *Id.* Two and half years later, he filed this lawsuit.

## ARGUMENT

### I.  Legal Standard

"To survive a motion to dismiss for failure to state a claim upon which relief can be granted, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Butler v. Deutsche Bank Trust*, No. 12-10337-DPW, 2012 U.S. Dist. LEXIS 114196, *9 (D. Mass. Aug. 14, 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The First Circuit has stated that, to determine whether the factual allegations in the complaint are sufficient to survive a motion to dismiss, the Court should "employ a two-pronged approach." *Soto–Torres v. Fraticelli*, 654 F.3d 153, 158 (2011). "The first prong is to identify the factual allegations and to identify statements in the complaint that merely offer legal conclusions couched as facts or are threadbare or conclusory." *Id.* "The second prong is to ask whether the facts alleged would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 159.

"The make-or-break standard…is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Id.*; *see In re iBasis, Inc. Deriv. Litig.*, 532 F. Supp. 214, 219 (2007). Under this standard, a pleading that rests on legal conclusions couched as fact or a threadbare recital of the elements of a cause of action will not suffice. *See Butler*, 2012 U.S. Dist. LEXIS at *9 (the Court will "disregard statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action"). Nor can a

pleading which rests on allegations drawn from specific documents survive if those allegations are not supported by the documents themselves. *See Zurich Am. Ins. Co. v. Watts Regulator Co.*, 796 F. Supp. 2d 240, 245 (D. Mass 2011) (citing *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) and dismissing defendant's counterclaims because invoices submitted therewith belied the defendant's own allegations). If a document or contract serves as the basis for plaintiff's claim, the Court need not merely accept allegations derived therefrom, but should review the document or contract itself to determine if the allegations have merit. *See id.*

## II.     Declaring the Patent Assignment Void Would Ignore the Consideration Received by Plaintiff as a Graduate Student, and Would Undermine the Bayh-Dole Regime

This case should begin and end with Plaintiff's Assignment to Harvard of his "entire right, title and interest" in the Pioneering Tetracycline Patents. *See* Ex. B. Upon execution of the Assignment, any rights Plaintiff had in these Patents – including any rights to any particular amount of royalty payments – were extinguished. Accordingly, Plaintiff's claims for damages associated with royalties obtained (and to be obtained) by Harvard through the Patents must be dismissed.

To avoid dismissal and advance his claims, Plaintiff employs two contradictory stratagems, pleaded in the alternative. The first requests that this Court declare his Assignment to Harvard void for a purported lack of consideration. *See* Compl. ¶¶ 255-257. Plaintiff's argument assumes that the only possible consideration Harvard could have given him in exchange for the Assignment was a binding promise that it would abide by its internal IP Policy. *See id.* Indeed, Plaintiff contends that "[i]f Harvard did not have an obligation to abide by its IP Policy, it did not give Dr. Charest any consideration for executing these assignments." *Id.* at ¶ 257.

As discussed below, Harvard made no such promise to Plaintiff through the Assignment. *Infra* 11. But, contrary to Plaintiff's conclusory assertion, that does not mean that consideration was lacking. The Assignment itself acknowledges the receipt of "good and valuable consideration," s*ee* Ex. B, and this Court has recognized that such consideration is present when analyzing similar

assignments of patent rights.  *See, e.g., Nortel Networks, Inc. v. Foundry Networks, Inc.*, No. 01-CV-10442-DPW, 2003 U.S. Dist. LEXIS 28064, at *6, n. 4 (D. Mass. Mar. 24, 2003), *adopted by* 2004 U.S. Dist. LEXIS 31544 (D. Mass. Jul. 29, 2004) (citing *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1581 (Fed. Cir. 1993) and stating that such things as "employment, salary, and bonuses are all valid forms of consideration for such assignments"). Plaintiff's "signature is the 'natural formality' authenticating the [Assignment], and [the] recital…that a stated consideration has been given is evidence of that fact as against'" him.  *Knott v. Racicot*, 442 Mass. 314, 324 (2004) (citing and quoting RESTATEMENT (SECOND) OF CONTRACTS § 87).  Indeed, "[t]he law does not concern itself with the adequacy of consideration; it is enough if it is valuable." *Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*, 357 Mass. 40, 43 (1970).

In this case, the clear and valuable consideration afforded to Plaintiff was the opportunity to work and study at Harvard, utilize Harvard's academic resources, access Harvard's faculty, obtain a PhD, and otherwise enjoy the benefits and stature of being a graduate student at a leading academic research institution.  Additionally, and most important for the instant purposes, the consideration afforded to Plaintiff included the opportunity to conduct federally-sponsored research at Harvard.

Pursuant to the framework instituted by the Bayh-Dole Act, 35 U.S.C. §§ 200, *et seq*., universities and nonprofits engaged in scientific research, where federal funds are provided primarily in support of that research, *must* obtain assignments of any intellectual property created by their personnel.  Federal regulations require any such funding agreement awarded to a university or nonprofit to include a "patents rights clause," whereby the institution is obligated to obtain from its personnel a written agreement that any "subject invention" will be disclosed, and that "all papers necessary to file patent applications on subject inventions and to establish the government's rights in the subject inventions" will be executed.  *See* 37 C.F.R. §§ 401.3, 401.14(a).  The policies of federal agencies awarding such research funds, moreover, expressly mandate that universities must

obtain valid assignments. Guidance documents made available to recipients of federal funds from the National Institutes of Health ("NIH"), for example, provide that "[b]y law, an inventor has initial ownership of an invention and that contractors should therefore have in place employee agreements requiring an inventor to assign or give ownership of an invention to the organization upon acceptance of Federal funds." *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 131 S. Ct. 2188, 2199 (2011) (quoting NIH Policies, Procedures, and Forms, A "20-20" View of Invention Reporting to the NIH (Sep. 22, 1995)); *see also* NIH Grants Policy Statement, pp. 113-120 (Dec. 1, 2003) (copy attached hereto as **Exhibit G**).

In compliance with this framework, the arrangement with graduate students and faculty at universities across the country is that, in consideration for the opportunity to engage in federally-funded research, assignments to any intellectual property created from that research ("subject inventions") must be granted to the institution. This case is no different. The research contributing to the Pioneering Tetracycline Patents was federally-funded. *See* Ex. A (indicating that research was funded pursuant to NIH grant # RO1A148825 and NSF predoctoral fellowship # R10964). Accordingly, Harvard was required to obtain assignments from its personnel engaged in that research. The consideration received by Plaintiff for assigning his rights to the Pioneering Tetracycline Patents to Harvard included, among other things, the opportunity to conduct this federally-sponsored research. Plaintiff's argument that this opportunity, along with the additional benefits and opportunities that come with being a Harvard graduate student, are not sufficient consideration to validate the Assignment, is not only an attack against the particular Assignment in this case, but also an attack against the entire Bayh-Dole regime.

As the Bayh-Dole Act remains federal law, it is plain that Plaintiff's attack must fail. The consideration supporting the Assignment is clear. Accordingly, Plaintiff's request that the Assignment be rescinded should be rejected, and all related claims should be dismissed.

III.      **Harvard's Internal IP Policy is Not a Contract**

As an alternative to his claim that the Assignment to Harvard lacked consideration, Plaintiff

argues that, through the Assignment, Harvard somehow "contracted to abide by its IP Policy." *See*

Compl. ¶ 224.  With the exception of his Declaratory Judgment claim (Count Six), every one of

Plaintiff's "Claims for Relief" is premised on the assumption that Harvard's internal IP Policy was a

valid and enforceable contract between Harvard and Plaintiff in which Plaintiff possessed legally

cognizable rights.  Indeed, each of Plaintiff's claims rests on the assumption that, despite assigning

away his *entire* right, title and interest in the Pioneering Tetracycline Patents, he still had some legal

right through the IP Policy to a particular percentage of royalty payments under those Patents.  That

foundational assumption is simply wrong.

As a threshold matter, there is absolutely nothing in the Assignment that would suggest that,

through it, Harvard "contracted to abide by its IP Policy." Compl. ¶ 224.  The IP Policy is not

mentioned, referenced, or otherwise implicated by the Assignment.  *See* Ex. B.  Plaintiff's

conclusory allegation that Harvard "contracted to abide by its IP Policy when [Plaintiff] signed the

Teracycline Assignments," is empty and must be rejected.  *See Butler*, 2012 U.S. Dist. LEXIS at *9

(Court should "disregard statements…that merely offer legal conclusions couched as fact").

Stepping outside the four corners of the Assignment also provides no basis to conclude that

the IP Policy is a binding contract between Plaintiff and Harvard.  In Massachusetts, an internal

policy – such as an employee handbook or manual – can be deemed an implied contract only under

limited circumstances.  In *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8 (1988), the

Supreme Judicial Court identified several factors demonstrating that no implied contract existed in

that case.  *Id.* at 14-15.  The factors included whether the employer retained the right to unilaterally

modify the policy, whether there was any negotiation between the employer and employee over the

policy's terms, and whether there was any assent to the policy by the employee.  *See id.*

Since *Jackson*, Massachusetts courts have applied these factors and dismissed claims alleging breach when no facts are alleged that support the proposition that an internal policy constitutes an implied contract.  *See, e.g., Britton v. Athenahealth, Inc.*, No. 2012-02457, 2013 Mass. Super. LEXIS 47, at *17-19 (May 3, 2013) (granting defendant's motion to dismiss "[g]iven the lack of facts supporting the proposition that the employment manual constituted a contract between [plaintiff] and [defendant]").  Here, the result should be the same.  Harvard expressly "reserve[d] the right to amend or modify any of the terms of th[e] Policy as it may determine from time to time." Ex. F, § 6(C); *see* Ex. C, Intro. p.1, §§ 9, 12.  Harvard also made clear that, in certain circumstances, it could make exceptions to the Policy whenever it was deemed to be in the University's "best interests." *See* Ex. F at Intro., p. 3.  Plaintiff has made no allegations indicating that he negotiated the Policy or had a hand in its drafting.  Nor is there anything to indicate that Plaintiff's assent to the Policy or any of its terms was somehow required for the Policy to take effect.  In short, there is nothing to support the conclusion that Harvard's internal IP Policy was a contract, express or implied, with Plaintiff.

For that reason, all of Plaintiff's claims that rest on the assumption that the IP Policy gives him some legally cognizable right to receive any particular share of royalties associated with the Pioneering Tetracycline Patents – notwithstanding his assignment of his interest in those Patents – cannot be sustained.  This Court should, therefore, dismiss Counts I – V and VII – X with prejudice.

**IV.**     **The Statute of Limitations Bars All Claims Concerning the Allocation of Royalties Under the Pioneering Tetracycline Patents**

Plaintiff's claims concerning the allocation of royalties under the Pioneering Tetracycline Patents also must be dismissed because these claims are barred by the applicable statute of limitations.  As stated above, the alleged misconduct described in the Complaint falls into two general categories — those circumstances surrounding the allocation of royalties among the inventors under the Pioneering Tetracycline Patents, and circumstances surrounding the allocation

of royalties between the Pioneering Tetracycline Patents and the Intermediary Method Patent.
*Supra* 2-7.  Counts II and VIII, for fraud and promissory estoppel, appear limited to the first
category; and Counts V, VII, IX, and X, for unjust enrichment, breach of fiduciary duty, and
violation of c. 93A § 9 and § 11, rest, at least in part, on this first category as well.

The applicable statute of limitations is 3 years for fraud and breach of fiduciary duty (G.L. c.
260, § 2A), 4 years for violations of c. 93A (G.L. c. 260, § 5A), and up to 6 years for promissory
estoppel and unjust enrichment (G.L. c. 260, § 2).[3]  The alleged misconduct concerning the
allocation of royalties among the inventors of the Pioneering Tetracycline Patents took place in
2006.  *See supra* 5.  This case was not filed, however, until June 28, 2013—more than six years
later.  Accordingly, all claims based upon this allocation, including Counts II and VII, in whole, and
Counts V, VII, IX, and X, in part, are barred by the statute of limitations and must be dismissed.

**V.      Plaintiff's Conclusory Allegations Concerning the IP Committee's Allocation
Decision Should be Rejected, and All Claims Related Thereto Should be Dismissed**

Plaintiff's claims based upon the second category of alleged misconduct – concerning the
allocation of royalties between the Pioneering Tetracycline Patents and the Intermediary Method
Patent – also must be dismissed.  These claims include Counts I, III, and IV, for breach of contract,
"indirect" fraud, and tortious interference, in whole; and Counts V, VII, IX, and X, for unjust
enrichment, breach of fiduciary duty, and violation of c. 93A § 9 and § 11, in part.  The claims fail
because each is founded on the conclusory allegations that the purpose and effect of the allocation
was to financially benefit Dr. Myers to the detriment of the other inventors, including Plaintiff.

Specifically, Plaintiff weaves a conspiracy theory alleging that Dr. Myers, OTD, Harvard's
outside patent counsel, Dr. Baker, and Dr. Plamondon, an executive at Tetraphase, all committed

---

[3] A claim for unjust enrichment sounding in tort, as opposed to contract, has a statute of limitations of only 3 years. *See
Cambridge Literary Props., Ltd. v. W. Goebel Porzellenfabrik G.m.b.H. & Co. Kg.*, 448 F. Supp. 2d 244, 262-64 (D.
Mass. 2006).  Here, Plaintiff's unjust enrichment claim, in Count V, is broadly pled, concerning unspecified
"inequitable actions." Compl. ¶ 253.  It could, therefore, be construed as sounding in tort.

fraud on the IP Committee by misrepresenting the relative value of the Intermediary Method Patent *vis-à-vis* the Pioneering Tetracycline Patents. *See generally* Compl. ¶¶ 90-214. Plaintiff claims that "OTD submitted information to the IP Committee that they knew was false…in order to support their shift of royalties to the Intermediary Method Patent." *Id.* ¶ 240. He asserts that "Dr. Myers discussed shifting royalties to the Intermediary Method Patent with Dr. Plamondon and members of OTD," and "worked with members of OTD, Dr. Baker, and Dr. Plamondon to submit information to the IP Committee in order to induce Harvard to breach its obligations." *Id.* ¶¶ 246-247.

According to Plaintiff, the motivation behind this supposed conspiracy was to financially benefit Dr. Myers. *See id.* ¶¶ 238, 253-254, 262 (stating that "Dr. Myers stood to gain financially from a shift in royalties from the Pioneering Tetracycline Patents to the Intermediary Method Patent," that he was "unjustly enriched" thereby, and that he acted "to secure more royalties for himself to the detriment of [Plaintiff]"). Plaintiff alleges that Dr. Myers financially benefitted because his percentage share of royalties under the Intermediary Method Patent was greater than 50%, whereas his share under the Pioneering Tetracycline Patents was only 50%. *See id.* ¶¶ 99-100. Therefore, pursuant to Plaintiff's "information and belief," the higher the percentage of royalties allocated to the Intermediary Method Patent, the greater the payout for Dr. Myers. *Id.* ¶ 100 ("On information and belief, Dr. Myers's share of Inventor Royalties for [the] Intermediary Method Patent was higher than his share of the Inventor Royalties for the Pioneering Tetracycline Patents and Dr. Myers benefitted from a shift in royalties to the Intermediate Method Patent.").

The problem with this concocted theory is that there is nothing to support it. The majority of Plaintiff's allegations are asserted "on information and belief." His foundational allegation, that Dr. Myers received greater than 50% of all royalties under the Intermediary Method Patent, is rank speculation. Indeed, Plaintiff admits in his Complaint that he repeatedly sought information regarding the allocation under the Intermediary Method Patent, *but never received it. Id.* ¶ 98.

Under Harvard's IP Policy, the presumptive allocation among multiple inventors under the same patent is an equal share to each. *See* Ex. C, App. A § 6(b); Ex. D, § 6(b); Ex. E, § 5(E)(1); Ex. F, § 5(E)(1). With respect to the Intermediary Method Patent, there were two inventors—Dr. Myers and Dr. Brubaker. Compl. ¶ 97. Accordingly, the presumptive allocation to Dr. Myers would be 50%, not more. If that was the allocation – which, in fact, it was – then Dr. Myers would have been allocated 50% under both the Intermediary Method Patent and the Pioneering Tetracycline Patents. Royalties paid to Dr. Myers would be the same, therefore, *no matter the allocation determined by the IP Committee*.

Plaintiff's conclusory allegations cannot overcome the IP Policy's presumption that Dr. Myers's allocation under the Intermediary Method Patent was only 50%. If the Court rejects those empty conclusions, which it must under *Twombly* and *Iqbal*, then Plaintiff's entire conspiracy theory falls apart, and all claims based upon it must be dismissed.

## VI.     Plaintiff Does Not Have Standing to Assert a Claim for "Indirect Fraud"

In addition to the deficiencies set forth above, Count III must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) because Plaintiff lacks standing to assert a claim for "indirect fraud." "A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) is appropriate when the plaintiff lacks standing to bring the claim." *Oum v. Wells Fargo, N.A.*, 842 F. Supp. 2d 407, 411 (D. Mass. 2012). A plaintiff's lack of standing also serves as a basis for a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Katz v. Pershing, LLC*, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) ("a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)"). "The burden of establishing standing rests with the party invoking federal jurisdiction" — here, the Plaintiff. *Oum*, 842 F. Supp. 2d at 411.

Apart from the minimum constitutional requirements for standing (*i.e.*, that there be a "case and controversy"), the Supreme Court recognizes other limits "on the class of persons who may

15

invoke the courts' decisional remedial powers." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The general rule of standing is that "a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth,* 422 U.S. at 499.  In limited circumstances, however, a litigant will be deemed to have "third-party standing."  *See Singleton v. Wulff*, 428 U.S. 106, 115-116 (1976).  In order to have third-party standing, the litigant "must have suffered an injury in fact; have a close relationship to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests."  *Powers v. Ohio*, 499 U.S. 400, 410-411 (1991); *see also Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007).

In this case, Plaintiff's claim for "indirect fraud" properly belongs to the IP Committee.  Indeed, for purposes of Count III, Plaintiff alleges that fraudulent information was submitted to the Committee and that the Committee relied upon it.  *See* Compl. ¶¶ 237-242.  While Plaintiff alleges that he was harmed by this fraudulent conduct, he does not allege that any fraud was committed on him or that he relied to his detriment on any fraudulent conduct or misrepresentations.  *See id.*

Because the only fraud alleged in Count III was fraud on the IP Committee, the resulting claim belongs to the Committee.  If Plaintiff is able to assert this claim, therefore, he must establish third-party standing.  Yet Plaintiff has made no allegations establishing a close relationship between himself and the Committee.  In fact, the Complaint makes clear that Plaintiff never directly interacted with the Committee.  *See* Compl. ¶¶ 186-206.  His only contact with the Committee was the submission of a cover letter and written presentation in connection with his appeal.  *See id.* What is more, Plaintiff has made no allegations indicating that the IP Committee lacks the ability to protect its own interest.  *See Powers*, 499 U.S. at 410-411.  Because no barrier exists, any fraud committed on the IP Committee can be redressed by the Committee itself.  Plaintiff does not have standing to assert such a claim on the Committee's behalf, whether directly or "indirectly."

Accordingly, Count III must be dismissed.

**VII.**      **Plaintiff Did Not Have a Fiduciary Relationship With Dr. Myers**

Count VII, for breach of fiduciary duty, must also be dismissed, because no fiduciary relationship existed between Plaintiff and Dr. Myers.  Plaintiff's fiduciary duty claim rests on the allegations that Dr. Myers headed the laboratory in which Plaintiff worked and served as his PhD advisor.  *See* Compl. ¶¶ 259-261; *But see id.* ¶ 17 (alleging that Plaintiff  "directed almost all of his [own] research efforts").  Such allegations do not establish a fiduciary relationship.

In *Battenfield v. Harvard Univ.*, for example, plaintiff claimed that, by virtue of her position as a student in Harvard's Master of Liberal Arts program, a fiduciary relationship existed between herself and her academic advisor.  *See id.*, No. 91-5089-F, 1993 Mass. Super. LEXIS 253, at *3-4, 28 (Aug. 31, 1993).  The Massachusetts Superior Court squarely rejected that claim, holding that "no such relationship exists as a matter of law." *Id.* at * 28.  The Court stated that "[o]ne party cannot unilaterally transform a business or academic relationship into a fiduciary relationship by reposing trust and confidence in another." *Id.* at *28-29.  "Mere respect for the judgment of another or trust in his character is not enough to constitute such a relation… If the relation is a business one, the existence of mutual respect and confidence does not make it fiduciary." *Id.* at *29 (quoting *Comstock v. Livingston*, 210 Mass. 581, 584 (1912)); *see, e.g., Ryan v. Univ. of N.C. Hosps.*, No. COA04-16, 2005 N.C. App. LEXIS 402, *8-12 (Mar. 1, 2005) (finding that no "fiduciary relationship exists between educator/supervisors and medical residents"); *Hendricks v. Clemson Univ.*, 353 S.C. 449, 458-59 (2003) (South Carolina Supreme Court "decline[d] to recognize the relationship between advisor and student as a fiduciary one"); *Shapiro v. Butterfield*, 921 S.W.2d 649, 651 (Mo. App. 1996) (affirming motion to dismiss fiduciary duty claim, stating that plaintiff "failed to adequately allege that a fiduciary relationship existed," and "cite[d] no cases in which a fiduciary relationship has been found to exist between a student and a faculty advisor").

Here, Plaintiff cannot unilaterally transform his former academic relationship with Dr.

Myers into a fiduciary relationship.  As a matter of law, the allegations in the Complaint do not support the existence of any fiduciary relationship or permit the imposition of any fiduciary duty onto Dr. Myers.  Accordingly, Plaintiff's breach of fiduciary duty claim must be dismissed.

**VIII.** **Plaintiff is Not a Consumer for Purposes of G.L. c. 93A, § 9, and Neither G.L. c. 93A,  § 9 Not § 11 are Applicable to the Intra-Enterprise Disputes Plaintiff Alleges**

Finally, and in addition to the applicable reasons set forth above, Plaintiff's claims under G.L. Chapter 93A must be dismissed because Chapter 93A does not apply in these circumstances. As a threshold matter, Plaintiff cannot sustain claims under both Sections 9 and 11 of Chapter 93A. *See Blue Cross Blue Shield of Mass. v. AstraZeneca Pharm.*, 582 F.3d 156, 191 (1st Cir. 2009) (stating that Sections 9 and 11 are "mutually exclusive and plaintiffs' claims can proceed under only one section").  Section 9 applies to consumer transactions.  *See id.* The allegations in this case, however, do not stem from a consumer transaction.  Rather, they involve participation in federally-funded research, preparation of patent applications, assignments of the rights to those patents, their commercialization, and the allocation of patent royalties amongst inventors.  *See generally* Compl. For that reason, Plaintiff has no viable claim under Section 9 of Chapter 93A.

Nor does Plaintiff have a claim under Section 11.  For Chapter 93A to apply, the underlying dispute must be "commercial" in nature.  *See Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 22-23 (1996).  A dispute between parties in the same venture is not "commercial" for purposes of Chapter 93A, and a claim concerning such a dispute cannot be advanced under either Sections 9 or 11.  *See Szalla v. Locke*, 421 Mass. 448, 451 (1995).  Indeed, the "unfair or deceptive acts or practices prohibited [by Chapter 93A] are those that may arise in dealings between discrete, independent business entities, and not those that may occur within a single company." *Id.* Accordingly, Massachusetts courts have held that Chapter 93A does not apply to a variety of "intra-enterprise disputes," including, for example, disputes between parties to a joint venture and fellow shareholders in a close corporation (*see, e.g., Zimmerman v. Bogoff*, 402 Mass. 650, 662-663

18

(1988)), claims by a corporate stockholder against a corporation concerning the internal governance of the corporation (*see, e.g., Riseman v. Orion Research Inc.*, 394 Mass. 311, 313-314 (1985)), disputes in the employer-employee context (*see, e.g., Manning v. Zuckerman*, 388 Mass. 8, 14-15 (1983)), and disputes between individual members of the same partnership involving the partnership business (*see, e.g., Newton v. Moffie*, 13 Mass. App. Ct. 462, 469-70 (1982)).

Here, Plaintiff's claims under Chapter 93A do not involve "commercial" transactions. Rather, these claims seek redress for the reduction in Plaintiff's allocation of royalties resulting from the purportedly unfair and deceptive conduct of Defendants in connection with the application of Harvard's internal academic policy on intellectual property to which he was subject. *See* Compl. ¶¶ 272-275. Indeed, the disputes advanced in the Complaint are confined to Harvard's *internal* IP Policy and the rights Plaintiff purports to have thereunder as a member of the Harvard community. *See generally* Compl. This is precisely the type of internal intra-enterprise dispute to which Chapter 93A does not apply. For that reason (as well as the additional reasons given above), Plaintiff's claims for violation of Chapter 93A in both Counts IX and X of the Complaint must be dismissed.

## IX.      The Complaint Should Be Dismissed With Prejudice

This case should be dismissed with prejudice, as the deficiencies set forth above cannot be cured by an amended pleading. Specifically, all of Plaintiff's claims concerning the purported unfair allocation of inventor royalties under the Pioneering Tetracycline Patents are barred by the statute of limitations. *Supra* 12-13. The alleged misconduct surrounding this allocation took place in 2006, more than six years before this case was filed. *Id.* Plaintiff expressly assented to this allocation in 2006, even though he "understood [others] to be threatening him." *See* Compl. ¶¶ 75, 83. There is, therefore, no basis for him to argue that the statute does not apply.

Similarly, Plaintiff cannot salvage his claims concerning the purported unfair allocation of royalties between the Pioneering Tetracycline Patents and Intermediary Method Patent. As

discussed above, Plaintiff's conspiracy theory rests on the foundational assumption that Dr. Myers financially benefitted from a shift in the allocation of royalties away from the Pioneering Tetracycline Patents and to the Intermediary Method Patent.  *Supra* 13-15.  For this assumption to be sustained, however, it must be demonstrated that Dr. Myers had a higher percentage share of royalties in the Intermediary Method Patent than in the Pioneering Tetracycline Patents (*i.e.*, Dr. Myers's share must be greater than 50%).  *Id.*  Plaintiff, admittedly, does not know Dr. Myers's share of royalties in the Intermediary Method Patent.  *See* Compl. ¶ 98.  He alleges, "on information and belief," that it is greater than 50%, but that allegation conflicts with the presumption in the IP Policy that the two inventors on the Intermediary Method Patent will have a 50-50 split.  *Supra* 14-15.  Moreover, the reality is that a 50-50 allocation is the actual allocation on the Intermediary Method Patent.   Accordingly, Plaintiff's claims are doomed to fail, regardless of any amendment.

Because Plaintiff's claims concern the two broad categories of purported misconduct just discussed, and because those claims cannot be sustained through an amended pleading, dismissal should be with prejudice.

## RELIEF REQUESTED

For the reasons set forth above, Defendants respectfully request that this Court dismiss Plaintiff's Complaint with prejudice.

Dated: September 3, 2013                                   Respectfully submitted,

*/s/ Michael J. Tuteur*
Michael J. Tuteur (BBO #543780)
Geoffrey M. Raux (BBO #674788)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Tel:  (617) 342-4000
Fax: (617) 342-4001
*mtuteur@foley.com*
*graux@foley.com*

*ATTORNEYS FOR DEFENDANTS*