UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
MARK G. CHAREST,                      )
                                      )
          Plaintiff,                  )    CIVIL ACTION NO.
                                      )    13-11556-DPW
     v.                               )
                                      )
PRESIDENT AND FELLOWS OF HARVARD      )
COLLEGE and ANDREW G. MYERS,          )
                                      )
          Defendants.                 )
```

MEMORANDUM & ORDER
February 16, 2016

## I. BACKGROUND

While a chemistry graduate student at Harvard University, Dr. Mark Charest worked in a laboratory supervised by Dr. Andrew Myers. There, he, along with Dr. Myers and other scientists, discovered a novel and valuable method for creating synthetic tetracyclines, which have applications in the development of commercial antibiotics. Dr. Charest assigned his rights in the patents for this invention to Harvard, as he was required to do pursuant to the participation agreement that he signed with the University. Harvard, in turn, licensed these patents to Tetraphase, a company founded for the purpose of commercializing the patented invention. Dr. Charest claims that Harvard has now deprived him of the share of the royalty stream to which he is entitled from this license.

He alleges, first, that Harvard and Dr. Myers coerced him under threats and duress to enter an agreement which reduced his share of the royalties from the patents and increased Dr. Myers' share.  Second, he contends that Harvard amended the Tetraphase License to include additional patented technology, and then improperly allocated an outsize share of the Tetraphase License royalties to this new patent on which Dr. Myers was, but Dr. Charest was not, a listed inventor.

Dr. Charest contends that this conduct breached contractual obligations to him assumed by Harvard and embodied in Harvard's intellectual property policy, and also constitutes a violation of various common law and statutory prohibitions.  The Defendants move to dismiss.

## A.  *Factual Background*

The facts drawn from the Amended Complaint are as follows:

### 1.   Dr. Charest's Enrollment at Harvard

Dr. Charest enrolled at Harvard University as a doctoral student in the organic chemistry department in 1999.  Am. Compl. ¶ 10.  While a student, Dr. Charest was advised and mentored by Dr. Myers, and focused his research on investigating the synthetic creation of tetracycline antibiotics, a project suggested by Dr. Myers.  Am. Compl. ¶¶ 15-16.  Prior to Dr. Charest's enrollment, Dr. Myers had been unable to create a

route for creating new synthetic tetracyclines and told Dr. Charest that if he successfully worked out the problem "they could make a [] billion dollars."  Am. Compl. ¶¶ 8-9.

<u>2.</u>   <u>The Discovery of a Synthetic Route for the Production of Tetracycline Antibiotics</u>

In 2004, in collaboration with others, Dr. Charest discovered a method to synthetically create a new class of tetracycline antibiotics.  Am. Compl. ¶ 11.  More specifically, Dr. Charest discovered a method for taking an intermediary and using that intermediary to make a new class of tetracycline antibiotics in as little as three steps.  *Id.*  This invention was particularly valuable because of its potential to treat otherwise antibiotic-resistant bacteria.  Am. Compl. ¶ 12. Prior to the publication of Dr. Charest's doctoral thesis, Harvard began work on patenting the discovery and Dr. Charest worked with Harvard's patent counsel, Dr. C. Hunter Baker, on patent applications covering his research (the "Pioneering Patents").  Am. Compl. ¶¶ 13, 28.

After the patent applications were filed, Dr. Charest and his collaborators published the results of their research in the April 2005 issue of *Science* under the title "A Convergent Enantioselective Route to Structurally Diverse 6-Deoxytetracycline Antibiotics."  Am. Compl. ¶ 14.  Because his

3

contributions to the research were greatest, Dr. Charest was the first-listed author of the article.  Am. Compl. ¶ 15.  Based upon the results of his research on routes for the creation of synthetic tetracycline, Dr. Charest received his Ph.D. in organic chemistry in 2004.  Am. Compl. ¶ 10.

> 3.   The Harvard Participation Agreement and the Harvard Intellectual Property Policy

In 2003, while a student at Harvard, Dr. Charest signed the Harvard University Participation Agreement.  Am. Compl. ¶ 19, Ex. A.  That agreement confirms that Dr. Charest "ha[s] read and [] understand[s] and agree[s] to be bound by the terms of the 'Statement of Policy in Regard to Inventions, Patents and Copyrights'" and "understand[s] and accept[s] the provision of the University's royalty income sharing policy . . . as amended from time to time."  Am. Compl. Ex. A.

The Harvard University Royalty Sharing Policy for Intellectual Property (the "IP Policy") in effect from 2001 until 2008 provided that patent inventors share 35% of the first $50,000 of royalties and 25% of any amounts above $50,000.  MD Ex. D at 1.[1] The policy provided that, in the case of a single

---

[1] Although an evaluation of a motion to dismiss is typically limited to those facts alleged in the operative complaint, a court may consider "documents the authenticity of which are not disputed by the parties . . . documents central to plaintiffs' claim [and] documents sufficiently referred to in the

invention, "[e]ach inventor receives equal shares of the inventor(s)' portion, unless all inventors agree otherwise. A deviation from the policy of equal sharing requires a written agreement of all inventors." *Id.* at 3; Am. Compl. ¶¶ 23-24.

---

complaint." *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993). The documents attached as Exhibits A-G to the Defendants' Motion to Dismiss, consisting of the patent covering Dr. Charest's invention and his assignment of that patent to Harvard, Harvard's intellectual property policies, and the National Institute of Health's Grants Policy Statement fit within these categories. Accordingly, the Defendant's request for judicial notice of these documents, Dkt. No. 13, which has not been opposed by Plaintiff, will be GRANTED. I will also grant Defendant's request for judicial notice of documents identified as Exhibits E, and H-0 to the Defendant's supplemental motion to dismiss. Supplemental Exhibit D consists of the January 31, 2007 amendment to the license agreement between Harvard and Tetraphase. This document is sufficiently referred to in the complaint--and indeed central to Dr. Charest's claims--to warrant judicial notice, recognizing, however, that it does not constitute the entirety of or the final amendment to the license agreement between Harvard and Tetraphase. Plaintiff opposes judicial notice of Supplemental Exhibits F, G, and P to Defendant's supplemental motion to dismiss, contending that these documents are incomplete, misleading, incorrect, or unverified. Supplemental Exhibits F and G are Dr. Myers' conflict of interest disclosures to Harvard and his consulting agreement with Tetraphase. These documents are not sufficiently referenced in the complaint, not public documents, nor central to Plaintiffs' claim. Accordingly, I will not take judicial notice of them. Similarly, I will not take judicial notice of Supplemental Exhibit P, which consists of excerpts of Harvard's 30(b)(6) deposition witness addressing facts disputed by the parties. *See Freeman* v. *Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013) (refusing to consider documents which did not fit into the categories of documents enumerated in *Watterson* when considering motion to dismiss).

The IP Policy in effect from 2001 until February 2008 provided that, when more than one invention is included in a license agreement:

1. Ordinarily each invention/case included in a license shall be considered of equal value. Absent any objection from the inventors prior to distribution of income, license income not specifically linked to an invention/case will be equally divided among all inventions/cases included in the license.

2. If [Harvard's Office of Technology Transfer and Licensing] determines . . . that the inventions/cases should have unequal value, they will notify those individuals identified as inventors at that point in time. Absent any objection from the inventors prior to the distribution of income, license income not specifically linked to an invention case will be divided among the inventions/cases according to that determination.

3. If all the inventors of all the inventions/cases included in the license agree upon the relative value of those inventions/cases, income from that license will be allocated according to that valuation.

4. At such time as income is clearly attributable to individual inventions/cases (e.g., when the product actually being sold only uses one invention), income shall be allocated to the inventions/cases actually generating the income.

5. If any of the inventors disagrees with the above, he/she may appeal to the Committee on Patents and Copyrights. Any such appeal shall only apply to allocation of income received after the appeal unless the appeal is made within thirty days of the inventors being notified of the license agreement and the planned valuation of the inventions/cases.

MD Ex. D at 4.

6

This policy was amended in February of 2008.  The post-2008 version provides that for a single invention, "Personal . . . shares . . . will be allocated among Inventors . . . according to a written agreement among them or, if there is no agreement, in equal shares."  MD Ex. E, § 5(E)(1).  For multiple patents licensed as a package, the post-2008 policy provides that royalties will be shared:

> [a]s agreed in writing among all Inventors or, if no agreement, in equal shares among Inventors.  In the alternative, upon request of any of the Inventors, OTD will determine the relative value of each patent to the package with the Inventor(s) of each patent sharing equally in the value assigned by OTD.  The foregoing notwithstanding, where an executed license agreement assigns different values to different patents licensed as a package, that value shall be the value assigned for purposes of royalty sharing among Inventors.

MD Ex. E, § 5(E)(3).  The post-2008 agreement provides that OTD's determination of the relative value of the patents licensed as a package "may be appealed by the persons affected to the Committee on Intellectual Property for final determination."  MD Ex. E, § 5(F).  Section 6 of the post-2008 agreement provides that:

> The University Committee on Intellectual Property, appointed by the President, shall be responsible for interpreting this policy and resolving questions and disputes concerning it.  From time to time the Committee may suggest changes to this policy on its own initiative or at the request of the President and Fellows of Harvard College or its designee.

7

> Other responsibilities of the Committee include the
> hearing of appeals as provided under this policy and
> other such duties as may be assigned from time to time
> by the President and Fellows of Harvard College or its
> designee.
>
> In addition to the right to make changes specifically
> provided elsewhere in this policy, the University
> reserves the right to amend or modify any of the terms
> of this policy as it may determine from time to time.
> Any such modification or amendment shall become
> effective upon adoption by the President and Fellows
> of Harvard College or as of such other time as the
> President and Fellows of Harvard College shall
> specify.

MD Ex. E, § 6.

The policy was modified again effective October 4, 2010.
The post-2010 policy, like the 2008 version, provides that, for
a single patented invention, "Personal . . . shares . . . will
be allocated among Inventors . . . according to a written
agreement among them or, if there is no agreement, in equal
shares." MD Ex. F, § 5(E)(1). The 2010 amendments altered the
language governing distribution of royalties from multiple
inventions licensed as a package, providing that:

> First, Net Royalties will be allocated among the
> licensed Creations as agreed in writing among all
> Creators or, if no agreement, in equal shares among
> such Creations. In the alternative, upon request of
> any of the Creators, OTD will determine the relative
> value to the package of each of the Creations. The
> foregoing notwithstanding, where an executed license
> agreement assigns different values to different
> Creations licensed as a package, that value shall be
> the value assigned for purposes of allocating Net

> Royalties among such Creations.  Second, the Creator
> personal share . . . of Net Royalties so allocated to
> each of the Creations in the package will be allocated
> in accordance with Paragraph E.1.

MD Ex. F, § E(3).  As with the 2008 policy, the 2010 amendment

provides that determinations of relative value "may be appealed

by the persons affected to the Committee on Intellectual

Property for final determination."  MD Ex. F, § V(F).

The 2010 Amendments alter the third paragraph of Section 6,

so that that paragraph reads:

> In addition to the right to make changes specifically
> provided elsewhere in this policy, the University
> reserves the right to amend or modify any of the terms
> of this policy as it may determine from time to time.
> The President and the Fellows of Harvard College (the
> "Corporation"), the President of the University, and
> the Provost of the University each severally shall
> have the power to make such amendments and
> modifications.  Any such modification or amendment
> shall become effective upon adoption by the
> Corporation, President or Provost, as the case may be,
> or as of such other time as the Corporation, President
> or Provost, as the case may be, shall specify.

MD Ex. F, § 6(C).

The Statement of Policy in Regard to Inventions, Patents

and Copyrights in effect prior to 2001 states that "a standing

University Committee on Patents and Copyrights was created in

1975.  This committee has representation from the principal

faculties potentially affected by policies in this area and from

the administration, and its chairman is a senior administrative

officer of the University reporting directly to the President. It is charged with responsibility for interpreting and applying University policy in individual cases, and for recommending such changes in University policy as from time to time may be required."  MD Ex. C at 1.  No subsequent versions of the IP Policy refer to the Committee on Intellectual Property and/or Patents and Copyrights as a "standing" committee.

Harvard's "Concise Guide" to its IP Policy, which makes reference to the 2008 amendments to that policy, describes the "University Committee on Intellectual Property" as a "standing committee appointed by the President."  Am. Compl. Ex. C, § VI.

5. Dr. Charest Assigns the Patents to Harvard and Harvard Licenses the Patents to Tetraphase

In a document signed on August 17, 2005, Dr. Charest assigned his rights in the Pioneering Patents covering his work on the synthetic creation of tetracycline antibiotics to the President and Fellows of Harvard College.  Am. Compl. ¶ 29; MD Ex. B.  That document recites that the assignment was given "[i]n consideration of One Dollar ($1.00) and other good and valuable consideration."  MD Ex. B at 1.

At the time that he made the assignment, Dr. Charest expected that Harvard would abide by the IP Policy.  Am. Compl. ¶ 30.

10

Harvard, through OTD, licensed the Pioneering Patents to Tetraphase, a company created by OTD and Dr. Myers for the purpose of commercializing the Pioneering Patents.[2]  Original Compl. ¶ 41.  Dr. Myers served and serves as a founder and consultant for Tetraphase.  Original Compl. ¶ 42.  On the basis of the value provided by the Pioneering Patents, Tetraphase raised more than $25 million in funding from investors.  Original Compl. ¶ 44.  In the license agreement, Tetraphase agreed to pay Harvard milestone payments and royalties on future sales of tetracycline drugs, as well as an upfront payment of $250,000.  Original Compl. ¶¶ 44, 130.

The Tetraphase license is OTD's most successful license to date.  Over the life of the license, OTD could claim credit for bringing in over $1 billion in revenue.  Am. Compl. ¶ 34.  As a

---

[2] In amending his complaint, Dr. Charest appears inadvertently to have omitted those factual allegations, included in the original complaint, regarding the founding of Tetraphase and the licensing of the Pioneering Patents to it.  I refer to those here from the original complaint to provide full context.  To the extent that Plaintiff's case survives motion to dismiss practice, I will direct Plaintiffs to file another amended complaint correcting this error, along with a redline for the court's review.  *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 169 (D. Me. 2004) (accepting correction of "typographical error" in complaint after filing of motion to dismiss).

result of the success of this license, Dr. Myers is held in high regard and given significant latitude by the OTD. *Id.*

6.  The Allocation of Royalty Shares from the Licensing of the Pioneering Patents

On August 8, 2006, Dr. Erik Halvorsen, then director of business development for OTD, emailed Dr. Charest and the other non-faculty inventors on the Pioneering Patents. Am. Compl. ¶ 35. Dr. Halvorsen's email informed the non-faculty inventors of the creation of Tetraphase and explained that, instead of an equal distribution of royalties, Dr. Myers would receive 50%, Dr. Charest, Dr. Seigel and Dr. Lerner would each receive 15%, and Dr. Brubaker would receive 5%. Am. Compl. ¶¶ 35-36. This allocation was made without consultation with the non-faculty inventors. Am. Compl. ¶ 40. Dr. Halvorsen's email included an agreement for them to sign. That agreement stated that "[w]e acknowledge that the Harvard University Royalty Sharing Policy for Intellectual Property specifies that, for inventions, the creators' share normally will be divided equally among all creators unless they agree otherwise." Am. Compl. ¶ 37.

After receiving the email from Dr. Halvorsen, Dr. Charest discussed the allocation with the other inventors. The other inventors agreed to adjust the shares so that Dr. Charest received 18.75%, Dr. Siegel received 11.25%, and Dr. Lerner and

Dr. Brubaker received 10% each.  Am. Compl. ¶ 38.  When approached by Dr. Charest, Dr. Halvorsen stated that Dr. Myers' share was not open to discussion.  Am. Compl. ¶ 39.

>  7.  Dr. Myers and Dr. Halvorsen Threaten Dr. Charest in Order to Induce him to Accept the Proposed Allocation

When Dr. Charest spoke with Dr. Myers expressing his opposition to the allocation, Dr. Myers told Dr. Charest to "tread lightly" and "be careful," which Dr. Charest understood to be threats.  Am. Compl. ¶ 39.  Dr. Myers followed through on these threats by refusing to act as a reference, a rarity in the field of academic chemistry, when Dr. Charest was applying for a venture capital job.  Am. Compl. ¶ 42.  This refusal was a contrast to the strong recommendations given by Dr. Myers to Dr. Charest prior to the royalty dispute arising.  Am. Compl. ¶ 43.

During discussions about the royalty allocation, Dr. Halvorsen told Dr. Charest that, if he did not accept the proposed allocation, he would reduce Dr. Charest's royalty share by allocating 50% of the license royalties to another, undisclosed patent on which Dr. Charest was not an inventor. Am. Compl. ¶ 46.  Dr. Halvorsen refused to show Dr. Charest the patent application even when Dr. Charest offered to sign a non-disclosure agreement, but represented that it warranted half of the license royalties.  Am. Compl. ¶¶ 48-49.

The undisclosed patent application has never been issued as a patent and has been effectively abandoned, indicating that it was of little value.  Am. Compl. ¶¶ 49-50.  Dr. Charest contends that this patent application was added to the Tetraphase License only as leverage to compel him to accept the allocation proposal, a belief which is supported by the fact that the patent application was filed and included in the license agreement only after the financial terms of the license had been agreed upon.  Am. Compl. ¶ 51.  If Dr. Charest had known that the undisclosed patent application had no or little value, he would not have agreed to accept less than the default equal allocation of royalties provided for in the Royalty Sharing Policy.  Am. Compl. ¶ 53.

8. <u>The Reallocation of License Income to the Intermediary Patent</u>

On November 24, 2009, Dr. Laura Brass, who replaced Dr. Halvorsen as the director of business development for OTD, wrote to Dr. Charest informing him that Harvard and Tetraphase had amended their license to include a new patent application (the "Intermediary Patent") and explaining that OTD was retroactively assigning 33% of the license income to the new patent application.  Am. Compl. ¶ 55.  The Intermediary Patent was licensed on January 31, 2007 to Tetraphase in exchange for a

one-time payment of $25,000.  Am. Compl. ¶ 57.  *See also* Supp. MD Ex. D.

The scope of the Intermediary Patent was narrower than the Pioneering Patent: The latter described new tetracycline compounds, methods of use and making those compounds, intermediaries used to make the compounds, and methods for making those intermediaries; the former described only an alternative method for making the intermediary.  Am. Compl. ¶ 56.

Dr. Charest contends that the $25,000 fee represents the true commercial value of the Intermediary Patent.  *See* Am. Compl. ¶¶ 59-64.  During conversations with the OTD, Dr. Charest said that the value assigned by the license agreement should control the allocation of royalties, as required by the Royalty Sharing Policy.  OTD refused to make an allocation in line with the $25,000 paid for the addition of the Intermediary Patent to the license.  Am. Compl. ¶ 66.

Dr. Charest spoke with Dr. Brass on December 12, 2009 regarding the allocation of royalties to the Intermediary Patent.  During that call, she told Dr. Charest that if he did not agree to the proposed re-allocation to the Intermediary Patent, his royalty share would be reduced even further than the proposed 33%.  Am. Compl. ¶ 67.  Dr. Brass also told Dr. Charest

that the 33% was not an OTD determination, but a proposal for
agreement and made clear that if he did not sign on OTD would
make an official determination that was less favorable.  Am.
Compl. ¶ 69.  Ultimately, Dr. Charest would not agree to the
proposed 33% allocation to the Intermediary Patent.  Am. Compl.
¶ 71.

>    9.    Harvard's Committee on Intellectual Property and the
>          Hearing Regarding the Royalty Allocation

Harvard's IP Policy (as effective after both the 2008 and
2010 amendments) provided that the Committee on Intellectual
Property (the "IP Committee") would be a committee appointed by
Harvard's President.  The IP Committee's responsibilities
include interpreting the IP Policy, and resolving questions and
disputes concerning it, as well as hearing appeals as provided
for under the IP Policy.  Am. Compl. ¶ 72-74; MD Exs. E, F, §
VI.  Dr. Charest alleges that the IP Committee is a standing
committee at Harvard which includes professors from Harvard's
business and law schools, a senior administrator, and members of
numerous other departments.  Am. Compl. ¶¶ 73, 75.

After Dr. Charest inquired about making an appeal of the
allocation of royalties to the Intermediary Patent, Dr. Maryanne
Fenerjian, the director of the Office of Technology Transfer,
responded on April 13, 2010, writing that:

The committee designated in the IP Policy as having
responsibility for such appeals is not a standing
committee, but instead must be convened on an *ad hoc*
basis.  If and when we receive your notice, I will
request that Provost Hyman appoint and seat the
committee.  Once he has done so, a committee
representative will contact you to schedule your
appeal and to answer any procedural questions that you
might have.  As the committee will set its own
procedures, I am afraid that I cannot offer you any
guidance with respect to the timing or mechanics of
the appeal process, should you elect to move forward
with it.

Am. Compl. ¶ 77, Ex. G.

Instead of sending the appeal of the OTD administrative

decision to a standing Committee on Intellectual Property, OTD

sent the appeal to this "*ad hoc* committee," appointed at the

request of OTD, which included four science professors, who,

rather than being independent and unbiased, relied upon OTD for

funding.  Am. Compl. ¶ 79.[3]

On December 15, 2010, Dr. Fenerjian wrote an email to Dr.

Charest telling him that "[t]he committee likely will meet for

the first time in mid-to-late January.  In preparation for that

---

[3] Dr. Charest has also alleged, contrary to OTD's
representations, that the committee was selected by OTD.  Am.
Compl. ¶ 80.  During the hearing on the Defendants' Motion to
Dismiss, it became clear that this specific allegation was
speculation cobbled together from inadequate circumstances and
raw conjecture, raising serious Rule 11 issues.  Recognizing
that Plaintiff lacks an adequate foundation for this allegation,
I will not consider this allegation when determining whether to
dismiss the complaint.

meeting, I will provide the committee members with background materials about the licensed technologies and efforts on the part of Tetraphase toward their eventual commercialization." Am. Compl. ¶ 82.  In response to this letter, Dr. Charest submitted a letter and a short PowerPoint presentation to the *ad hoc* committee on December 22, 2010.  Up to that date, Dr. Charest had not been provided with an articulation of OTD's reasoning for its allocation, and the materials that Dr. Charest sent to the committee provided only background information on the patents, rather than Dr. Charest's substantive arguments regarding the relative value of the Pioneering and Intermediary Patents.  Am. Compl. ¶¶ 84-85.  Dr. Charest closed his letter by expressing his interest in communicating with the *ad hoc* committee regarding the appeal and his willingness to travel to Harvard to participate in the process.  Am. Compl. ¶ 85.

On January 11, 2011, OTD submitted a memorandum to the *ad hoc* committee detailing their position on the valuation of the patents.  Dr. Charest was not provided a copy of the materials. Am. Compl. ¶ 86.  Shortly after, the committee met and two members of OTD attended, Isaac Kohlberg and Dr. Fenerjian.  Dr. Charest was not told about this meeting or given the opportunity to attend or present his views.  Am. Compl. ¶¶ 87-88.  Dr. Charest found out about this meeting only when he was informed

18

that his royalty share was being reduced as the royalties would be split 55% to the Pioneering Patents and 45% to the Intermediary Patent.  Am. Compl. ¶ 87.  Dr. Charest was never given an opportunity to present his views regarding the appropriate allocation of royalties between the Pioneering and the Intermediary Patents to the committee.  Am. Compl. ¶ 88.

Dr. Charest contends that OTD presented material and information to the *ad hoc* committee that was misleading and materially incorrect, and which overstated the value of the Intermediary Patent.  Am. Compl. ¶¶ 89-95.  In fact, Dr. Charest contends that if OTD's representations to the committee regarding the value of the Intermediary Patent were correct, they would have been negligent, unethical, or grossly incompetent in licensing that technology to Tetraphase, a company affiliated with Dr. Myers, for only $25,000.  Am. Compl. ¶ 96.  Dr. Charest contends that Dr. Myers controlled the OTD appeals process and engineered an outcome favorable to himself. Among the information provided to the committee were opinions by Dr. Hunter Baker and Dr. Louis Plamondon.  Dr. Myers and Dr. Baker knew each other well, having received their Ph.D.'s after working at the same laboratory at Harvard.  Am. Compl. ¶ 131. Dr. Baker had worked with Dr. Myers on a number of patenting issues, as well as issues related to the establishment of

Tetraphase.  *Id.*  Dr. Plamondon is Tetraphase's Vice President for Chemistry and has worked at Tetraphase since its founding, while Dr. Myers has acted as a consultant, per the licensing agreement.  *See* Am. Compl. ¶ 132, Ex. E.

At the same time that Dr. Charest was informed of the outcome of the appeal of OTD's allocation decision, Harvard requested that he sign a form acknowledging and accepting this decision as final as a condition of receiving the royalties owed to him.  Am. Compl. ¶ 100, Ex. B.  Subsequently, when contacted by Dr. Charest's counsel, Harvard requested a release of all claims against Harvard as a condition of the disbursement of royalties.  Am. Compl. ¶ 101.

10.  Dr. Myers' Motive to Allocate Royalties to the Intermediary Patent

In his original complaint, Dr. Charest alleged, upon information and belief, that Dr. Myers was motivated to reallocate royalties from the Pioneering Patents to the Intermediary Patent because he was entitled to a larger share of royalties from the latter than the former.  Limited discovery has shown that OTD in fact paid 100% of the royalties on that patent to another inventor, Dr. Brubaker.  Dr. Myers contends this was in error, and that OTD corrected the error by directing a payment of the correct (50%) share to himself (without

requiring a clawback of the incorrect payment to Dr. Brubaker).
Am. Compl. ¶ 107, Ex. F (Deposition of Dr. Andrew Myers) at
14:7-17:23.  Thus Dr. Myers' share of the royalties was not
increased by the re-allocation of royalty income to the
Intermediary Patent.

Dr. Charest now contends that the payment was made to Dr.
Brubaker as compensation for Dr. Brubaker performing research
which Dr. Myers was obligated to perform for Tetraphase and
which benefitted Dr. Myers and Tetraphase.  Am. Compl. ¶¶ 109-
114.  Dr. Charest contends that Dr. Myers directed Dr. Brubaker
to perform this research for his own and Tetraphase's benefit
and that this represents a violation of Harvard's ethical rules
and poses a conflict of interest for Dr. Myers in his dual roles
as a company scientist employed by Tetraphase and an academic
supervisor.  Am. Compl. ¶¶ 115-121.  By allocating royalties
from the Pioneering Patent to the Intermediary Patent, Dr. Myers
was able to compensate Dr. Brubaker for performing this work at
no cost to himself or Tetraphase, while, in effect, buying Dr.
Brubaker's silence and loyalty.  Am. Compl. ¶¶ 122-123.

11.  Demand under Massachusetts General Law Chapter 93A

On May 28, 2013, Dr. Charest sent a Chapter 93A demand
letter to Harvard and Dr. Myers describing his allegations and
the relief sought.  Am. Compl. ¶¶ 136, 138.  In their response

21

letter, Defendants did not offer any settlement to Dr. Charest, but instead asked Dr. Charest to sign a release of all claims against them in exchange for the disbursement of the royalties accrued and payable to Dr. Charest under Harvard's allocation. Am. Compl. ¶¶ 140-141.  Harvard had withheld any payment to Dr. Charest since Dr. Charest refused to accept the legitimacy of the 55%/45% allocation.  Am. Compl. ¶ 142.

In response to my request, Harvard filed additional briefing regarding its alleged refusal to make payments of royalty amounts owed to Dr. Charest according to Harvard's own determination of a 55%/45% allocation between the Pioneering and Intermediary Patents.  Harvard represented that "OTD requested that each inventor return a signed acknowledgment--*not* a release of claims--upon receipt of which OTD would distribute each inventor's respective share of the royalties" (emphasis by Harvard) and attached the letter dated March 1, 2011 in which Dr. Kohlberg, Harvard's Senior Associate Provost, wrote: "To acknowledge your acceptance of the Committee's determination, thereby enabling OTD to distribute to you your inventor share of such Net Royalties, please sign and date a copy of this letter in the space provided below, and return it to my attention at the above address."

In response, Dr. Charest filed an additional brief in which he contests Harvard's representation that it did not condition payment of Dr. Charest's share on his release.  Attached to that filing is a letter from Harvard's counsel to Dr. Charest's counsel.  The penultimate paragraph of that letter reads:

> As it has in the past, Harvard stands willing to distribute to Dr. Charest his percentage share of all royalty payments that have been received to date in connection with the tetracycline patents.  Harvard is holding these sums in escrow for Dr. Charest, which currently total $50,261.72, and is agreeable to releasing them upon his execution of the March 1, 2011 acceptance and acknowledgment letter regarding the allocation of royalties between the various patents released to Tetraphase.  In addition, given Dr. Charest's threat of litigation, an appropriate release of claims would also be required.

This letter fully belies Harvard's claim that it did not request a release from Dr. Charest in exchange for disbursement of funds that it admits owing to him.

Harvard has now represented that, as of February 3, 2014, it made payment to Dr. Charest of the amount owed according to the 55%/45% royalty allocation determination of the IP Committee and that it will make all applicable royalty payments to Dr. Charest going forward in a timely manner and without condition.

## B.  *Procedural Background*

Dr. Charest filed his first complaint in this matter on July 28, 2013.  Harvard and Dr. Myers moved to dismiss the case

for failure to state a claim pursuant to Federal Rule of Civil
Procedure 12(b)(6) and for lack of standing under Rule 12(b)(1).

At a hearing on December 19, 2013, recognizing that there
were certain factual disputes regarding the allocation of
royalties to Dr. Myers which could be easily resolved, I entered
an order permitting Dr. Charest to conduct limited discovery and
amend or supplement his complaint, and allowing the Defendants
to respond to any such amendments.

On January 17, 2014, Dr. Charest filed his amended
complaint.  Harvard and Dr. Myers subsequently filed additional
briefing in support of their previously-filed motion to dismiss.

I held a hearing regarding the motion to dismiss filed by
Harvard University and Dr. Myers on January 29, 2014.  During
that hearing, as discussed above, I requested additional
briefing from Harvard regarding the allegation that Harvard has
conditioned payment of amounts owed to Dr. Charest on his
execution of a release of claims against Harvard and whether
such conduct constitutes a violation of Massachusetts General
Law Chapter 93A.

Harvard filed additional briefing on February 3, 2014.  In
addition to discussing the refusal to make payments to Dr.
Charest, Harvard also offered evidence which it contends
contradicts Dr. Charest's allegation that he was not given

24

adequate notice and an opportunity to present his substantive arguments to the IP Committee.  In response, Dr. Charest contends that the evidence offered by Harvard is one-sided and incomplete.  He represents that he repeatedly requested information from Harvard University regarding the appeals process, but did not receive the requested information until after the completion of the appeals process.

The seriatim offers of evidence in this case by both parties demonstrates the wisdom of the phased decision-making process established by the Federal Rules of Civil Procedure. Those rules provide that, at this phase of the proceeding, before the parties have had the opportunity for discovery, my review is limited to testing the sufficiency of the allegations set forth in Dr. Charest's complaint, subject only to "narrow exceptions" for the consideration of certain extrinsic evidence. *See Freeman* v. *Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013); *see generally supra* note 4.  The sufficiency of the evidence of a party is tested only "after adequate time for discovery," *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  If genuine issues of material fact remain after such discovery, precluding the entry of summary judgment, those factual disputes are to be resolved by a trial.

I will not short-circuit this process by indulging in an attempt to resolve factual disputes based upon the tit-for-tat offers of evidence and representations of the parties.  While I will consider, along with the well-pled allegations in the complaint, those documents which are central to Dr. Charest's claim, I will not extend my review to include the weighing of evidence that the Defendants have submitted to contradict the allegations Dr. Charest has made regarding the opportunity (or lack thereof) afforded to him to participate in the IP appeal.

## II. STANDARD OF REVIEW

In order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). I "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993). While I am "generally limited to considering facts and documents that are part of or incorporated into the complaint," I "may also consider documents incorporated by reference in the [complaint], matters of public record, and other matters susceptible to judicial notice." *Giragosian* v. *Ryan*, 547 F.3d

26

59, 65 (1st Cir. 2008) (citation and internal quotation marks
omitted) (alteration in original).

Dismissal for failure to state a claim is appropriate when
the pleadings fail to set forth "factual allegations, either
direct or inferential, respecting each material element
necessary to sustain recovery under some actionable legal
theory." *Berner* v. *Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997)
(quoting *Gooley* v. *Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.
1988) (internal quotation marks omitted)). "[W]here the well-
pleaded facts do not permit the court to infer more than the
mere possibility of misconduct, the complaint has alleged--but
it has not 'show[n]'--'that the pleader is entitled to relief.'"
*Maldonado* v. *Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)
(quoting *Iqbal*, 556 U.S. at 679).

### III. ANALYSIS

Based upon the factual allegations detailed above, the
Plaintiff has asserted seven separate causes of action against
Harvard and/or Dr. Myers: (1) breach of contract; (2) fraud in
relation to the original allocation of royalties from the
Pioneering Patents; (3) tortious interference with contract; (4)
breach of fiduciary duty; (5) promissory estoppel; (6) violation
of Mass. Gen. Laws c. 93A, § 9; and (7) violation of Mass. Gen.
Laws c. 93A, § 11.

27

**A.  Has Plaintiff Adequately Alleged That Harvard's IP Policy
is a Contract?**

While brought under several different theories, Dr.
Charest's claims largely begin with a single common threshold
issue: Whether the IP Policy imposes binding contractual
obligations upon Harvard.[4]

In support of its contention that the IP Policy is not a
contract, Harvard relies primarily on *Jackson* v. *Action for
Boston Community Dev. Inc.*, 525 N.E.2d 411 (Mass. 1988), in
which the Massachusetts Supreme Judicial Court held that an
employer's personnel manual did not form the basis for an
implied contract of employment for a defined term.  In reaching
that conclusion, the Supreme Judicial Court identified several
factors relevant to that decision, including that: (1) the
employer retained the unilateral right to modify the manual's
terms; (2) the manual provided that it was for "guidance" as to
the employer's policies; (3) there was no negotiation between
the employer and the employee regarding the terms of the manual;

---

[4] On more than one occasion, Massachusetts courts have found that
an institution's intellectual property policies are binding on
individual employees as signatories.  *See, e.g., Greene* v.
*Ablon*, 2012 WL 4104792 (D. Mass. Sept. 17, 2012); *Grocela* v.
*General Hosp. Corp.*, No. 11-991-BLS1, 30 Mass. L. Rptr. 176
(Mass. Sup. Ct. July 18, 2012) (unreported decision).  In those
cases, as here, the individual expressly agreed to be bound by
the policy.

(4) the manual stated no term of employment; (5) the employer called no special attention to the manual; and (6) the employee did not sign or manifest his assent to the manual or acknowledge that he understood its terms.  *Id.* at 415-16.

Here, as in *Jackson*, Harvard retained the right unilaterally to modify the IP Policy.  It also appears that no negotiations occurred between the parties regarding the terms of the policy, again supporting Harvard's claim that it is not a contract.  Other factors, however, weigh in favor of Dr. Charest.  Harvard did call special attention to the IP Policy. In 2003, Dr. Charest signed a "Participation Agreement" in which he agreed to be bound by the IP Policy and in which he acknowledged that he understood and accepted the terms of Harvard's royalty sharing policy.  *See* Am. Compl. Ex. A.  In addition, while the manual at issue in *Jackson* spoke in terms of providing "Guidance," the IP Policy speaks in mandatory terms: "Except as otherwise provided in this policy, the following formula *will apply* to the distribution of Net Royalties among Creators . . ."; "Personal shares *will be* allocated among Inventors . . . according to a written agreement among them or, if there is no agreement, in equal shares."  MD Ex. F, § 5(B), (E) (emphasis added).

29

Looking at the factors identified in *Jackson* alone (upon which the defendant relies), I cannot conclude dispositively that the terms of the IP Policy are not a part of the contract between Harvard and Dr. Charest.

Furthermore, the factors in *Jackson* do not stand alone. Since *Jackson*, the Massachusetts Supreme Judicial Court has substantially clarified its teaching on the issue of when an employer manual becomes a part of an employment agreement.  In *O'Brien* v. *New England Tel. & Tel. Co.*, 664 N.E.2d 843 (Mass. 1996), the Supreme Judicial Court explained that the circumstances identified in *Jackson* "are not a rigid list of prerequisites, but rather explain factors that would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract."  *Id.* at 847.  The central question (upon which those factors shed light) is whether an employee "would reasonably conclude that the employer was presenting the manual as a statement of the conditions under which employment would continue."  *Id.* at 848.  *See also Ferguson* v. *Host Intern. Inc.*, 757 N.E.2d 267, 271 (Mass. App. 2001) ("[S]uch manuals [are] to be enforced to the extent that they instill a reasonable belief in the employees that management will adhere to the policies therein expressed.").

As noted, the Participation Agreement signed by Dr. Charest makes explicit reference to Harvard's royalty sharing policy-- supporting Dr. Charest's reasonable belief that Harvard would adhere to the policies therein.  In addition, the policy itself states that it is intended to be a "more definitive statement[] of policy that [is] applicable to the entire Harvard community" and that "[w]here royalties are generated by Harvard as a consequence of commercializing a Supported Invention, royalties will be shared with the Inventor(s) as described in Section V of this policy."  MD Ex. F at 1, § I(F).  Finally, Harvard's own conduct leads to the same conclusion.  According to Dr. Charest's allegations, in August of 2006, Dr. Halvorsen emailed Dr. Charest and the other non-faculty inventors of the Pioneering Patents.  In the email, Dr. Halvorsen specifically referenced the IP Policy and acknowledged that, absent agreement among the inventors, royalties from the commercialization of the invention would be divided equally among all the named inventors on the patent.  Am. Compl. ¶ 37.  Similarly, in its letter dated March 1, 2011, in which Harvard informed the inventors of the Pioneering Patents of the outcome of Dr. Charest's challenge to the allocation of royalties between the Pioneering and Intermediary Patents, Harvard specifically referenced the IP Policy as the basis for both the process and the outcome.  *See*

31

Am. Compl. Ex. B.  By following the IP Policy, Harvard's conduct
demonstrates that it does view the policy as imposing binding
obligations upon the university.  *See Jackson*, 525 N.E.2d at 415
("[T]he defendant's adherence to the grievance procedures is
some evidence of the existence of a contract.").

Dr. Charest contends that he expected Harvard to honor its
contractual obligations to pay him royalties as defined by the
IP Policy.  The Amended Complaint alleges a reasonable basis for
concluding, in light of the circumstances, that a contract
existed between Dr. Charest and Harvard, evidenced by the terms
of the Participation Agreement which Dr. Charest signed, by the
terms of the IP Policy, and by Harvard's conduct.  "'It would be
unfair to allow an employer to distribute a policy manual that
makes the workforce believe that certain promises have been made
and then to allow the employer to renege on those promises.'"
*Ferguson*, 757 N.E.2d at 272 (quoting *Woolley* v. *Hoffmann-La
Roche, Inc.*, 491 A.2d 1257 (N.J. 1985)).[5]

---

[5] In addition, although they are not binding upon me, I note that
this conclusion is in accord with a number of out-of-state cases
cited by the plaintiff in which courts have found that
university intellectual property policies are a part of the
employment contract.  *See, e.g., St. John's Univ., New York* v.
*Bolton,* 757 F. Supp. 2d 144, 161 (E.D.N.Y. 2010) ("Federal
courts have consistently upheld the validity of patent-
assignment obligations imposed on university students, faculty
and staff"); *Regents of the Univ. of New Mexico* v. *Knight*, 321

Dr. Charest alleges two separate time periods of misconduct on the part of Harvard and Dr. Myers with respect to the alleged contract.  The first occurred in 2006, when the university and Dr. Myers sought to obtain Dr. Charest's agreement to a royalty allocation that would grant Dr. Myers 50% of the royalty income from the licensing of the Pioneering Patents to Tetraphase.

The second instance of alleged misconduct began when Harvard informed Dr. Charest of OTD's decision to add the Intermediary Patent to the license agreement with Tetraphase and allocate a 33% share of the Tetraphase royalties to that patent. After Dr. Charest protested this decision, the committee hearing his appeal determined that the proper allocation was 55% to the Pioneering Patents and 45% to the Intermediary Patent.  I turn

---

F.3d 1111, 1118 (Fed. Cir. 2003) (finding that the university patent policy formed an "implied contract"); *Fenn* v. *Yale Univ.*, 283 F. Supp. 2d 615, 628-29 (D. Conn. 2003) ("University patent policies such as Yale's have long been recognized as a valid and enforceable part of the contract of employment.") (citing *Chou* v. *Univ. of Chicago*, 254 F.3d 1347, 1356-57 (Fed. Cir. 2001) and *Univ. of West Virginia Bd. of Trustees* v. *VanVoorhies*, 84 F.Supp.2d 759, 769-71 (N.D.W.Va. 2000)).  In *Molinelli-Freytes* v. *Univ. of Puerto Rico*, 2012 WL 4665638 (D.P.R. Feb. 15, 2012), the court held that ownership of intellectual property was not determined by the university's intellectual property policy.  In reaching that conclusion, however, the court specifically relied on 17 U.S.C. § 201(b), which provides that initial ownership of copyright in a work performed for hire may be altered only upon a express written agreement signed by both parties, *id.* at *13, making that specific holding inapposite here.

to a consideration of those two time periods in Sections III.B
and III.C below.

**B.   *Claims Based Upon the 2006 Allocation of the Pioneering
Patents Royalties Are Barred by the Statute of Limitations.***

According to Dr. Charest, in order to induce his agreement

to the 2006 allocation, Harvard, through Dr. Halvorsen,

misrepresented the existence of valuable technology that was

part of the Tetraphase license agreement and threatened to

divert royalties to that patent--reducing Dr. Charest's royalty

share--if Dr. Charest would not agree.  Dr. Myers, for his part,

is said to have used his position of authority to level threats

against Dr. Charest regarding his future employment prospects--

threats which were eventually carried out.

This conduct would arguably be actionable under one or more

of the theories asserted by Dr. Charest.  A party may not

misrepresent facts and then use those misrepresentations as

leverage to deprive another party of its contractual rights.

*See Massachusetts Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 648

N.E.2d 435, 438 (Mass. 1995) (holding that "conduct undertaken

as leverage to destroy the rights of another party to [an]

agreement while the agreement is still in effect" constituted

not only a breach of contract, but "warranted a finding of

unfair acts or practices" under Mass. Gen. Laws c. 93A);

34

*Anthony's Pier Four, Inc*. v. *HBC Assocs.*, 583 N.E.2d 806, 822 (1991) ("[K]nowing use of a pretext to coerce" a party into paying more than the amount owed under a contract constituted a breach of the contractual duty of good faith and fair dealing, and violated Mass. Gen. Laws c. 93A "as a matter of law.").

The statute of limitations, however, poses a hurdle to the claims arising from events occurring in 2006.  Claims for breach of contract and promissory estoppel are subject to a six year statute of limitations.  Mass. Gen. Laws c. 260, § 2.  A claim for violation of Mass. Gen. Laws c. 93A is subject to a four year statute of limitations.  Mass. Gen. Laws c. 260, § 5A. Claims for breach of fiduciary duty, tortious interference with contract, and fraud must be brought within three years.  Mass. Gen. Laws c. 260, § 2A.  Because claims arising from the initial allocation of royalties among the inventors of the Pioneering Patents relate to conduct that occurred more than six years before this action was filed, such claims presumptively are barred by the applicable statutes of limitation.

Seeking to avoid this result, Dr. Charest asserts that the running of the limitations period should be extended by the discovery rule which "tolls the commencement of the statute of limitations until the plaintiff knew or reasonably should have known of the alleged harm."  *Abdallah* v. *Bain Capital*, 880 F.

Supp. 2d 190, 197 (D. Mass. 2012).  The rule operates in three circumstances: "[W]here a misrepresentation concerns a fact that was 'inherently unknowable' to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive." *Patsos* v. *Albany Corp.*, 741 N.E.2d 841, 846 (Mass. 2001).

### 1. Was the Statute of Limitations Tolled Because These Claims were "Inherently Unknowable"?

"The discovery rule provides that a cause of action for the redress of an 'inherently unknowable' wrong does not accrue until the plaintiff knew, or in the exercise of reasonable diligence should have known, of the factual basis for a cause of action." *Patsos,* 741 N.E.2d at 846-47.  Tolling lasts until "events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed." *Felton* v. *Labor Relations Com'n*, 598 N.E.2d 687, 689 (Mass. App. 1992).  A plaintiff is placed on "inquiry notice" of his claims "when the first event occurs that would prompt a reasonable person to inquire into a possible injury at the hands of the defendant." *Epstein* v. *C.R. Bard, Inc.*, 460 F. 3d 183, 188 (1st Cir. 2006) (citing *Szymanski* v. *Boston Mut. Life Ins. Co.*, 778 N.E.2d 16, 20-21 (Mass. 2002)).  "[K]nowledge of 'every fact

36

necessary to prevail on the claim' is not required to put the plaintiff on inquiry notice and trigger the accrual period." *Id.* (citing *Int'l Mobiles Corp.* v. *Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d 122, 124 (Mass. App. 1990)).

Here, Dr. Charest alleges that he discussed the allocation of royalties from the Pioneering Patents with Dr. Myers and Dr. Myers told him to "tread lightly" and "be careful." As Dr. Charest explicitly alleges, he "understood these statements to be threats." Am. Compl. ¶ 41. When Dr. Halvorsen threatened to reduce Dr. Charest's share by allocating royalties to an undisclosed patent, Dr. Charest asked Dr. Halvorsen to show him the undisclosed patent application because he "wanted . . . to determine the veracity of Dr. Halvorsen's threat." Am. Compl. ¶ 49. These facts demonstrate that Dr. Charest had sufficient information to know that he had been harmed (by the reduction in his royalties) and that this harm resulted from improper conduct on behalf of both defendants.

### 2. Did the Defendants Breach a Fiduciary Duty of Disclosure?

Where a fiduciary relationship exists, a party's "failure to affirmatively and adequately disclose facts that would give rise to knowledge of the cause of action" tolls the limitation period "until the plaintiff actually becomes aware of the

operative facts underlying the cause of action." *OrbusNeich Medical Co., Ltd., BVI* v. *Boston Scientific Corp.*, 694 F. Supp. 2d 106, 115 (D. Mass. 2010) (citing *Demoulas* v. *Demoulas Super Markets, Inc.*, 677 N.E.2d 159 (Mass. 1997) and *Mass. Eye and Ear Infirmary* v. *QLT Phototherapeutics, Inc.*, 412 F.3d 215, 242 (1st Cir. 2005)).

Tolling on this basis necessarily relies on the existence of a fiduciary relationship.  Dr. Charest claims that Dr. Myers assumed the role of a fiduciary by virtue of his role as Dr. Charest's supervisor and academic advisor, and as head of Dr. Charest's laboratory, Am. Compl. ¶¶ 166-69, and that Dr. Myers breached his fiduciary obligations by using his position to obtain a more favorable share of the royalties from the tetracycline research at Dr. Charest's expense.  Am. Compl. ¶ 262.

Dr. Charest's attempt to allege a fiduciary relationship fails for two reasons.  First, I conclude that under Massachusetts law, a student-advisor relationship is not fiduciary in nature.  Justice Fremont-Smith of the Massachusetts Superior Court addressed precisely this issue in *Battenfield* v. *Harvard Univ.*, No. 915089F, 1 Mass. L. Rptr. 75 (Mass. Sup. Ct. Aug. 31, 1993), and held that the relationship of an academic advisor to a student does not constitute a fiduciary

relationship, explaining that "[o]ne party cannot unilaterally transform a business or academic relationship into a fiduciary relationship by reposing trust and confidence in another." *Id.* at \*9. (Citing *Comstock* v. *Livingston*, 97 N.E. 106, 108 (Mass. 1912)).[6]

Second, as Dr. Charest explicitly states in his opposition to the motion to dismiss "[t]his dispute involves Defendants' actions that span over a period of five years, *all after Dr. Charest had left Harvard.*" Even if a fiduciary relationship arising from the academic mentorship existed at some point between Dr. Charest and Dr. Myers, that relationship would have

---

[6] Dr. Charest contends that the relationship at issue in *Battenfield* v. *Harvard Univ.*, 1 Mass. L. Rptr. 75 (Mass. Sup. Ct. Aug. 31, 1993) was an employee-employer relationship, making that case inapplicable.  It is clear that, as to at least one defendant in *Battenfield*, Sue Weaver Schopf, the relationship was purely that of an academic advisor, which the court determined was not fiduciary in nature.  *Id.* at \*9.  Dr. Charest also relies upon *Chou*, 254 F.3d 1347, for the proposition that a student-advisor relationship is fiduciary in nature.  In addition to being decided under Illinois law, there were specific facts existing in *Chou* that are absent in the present case.  These include the fact that Chou's advisor "specifically represented to her that he would protect and give her proper credit for her research and inventions" and had "responsibility to make patenting decisions regarding Chou's inventions." *Chou*, 254 F.3d at 1362.  There is no allegation that Dr. Myers made any such promises or assumed such responsibilities with respect to Dr. Charest.

ended when Dr. Charest left Harvard and was no longer Dr. Myers'
supervisee.

Because Dr. Charest has not alleged the existence of a
legally cognizable fiduciary relationship--and certainly not one
which existed at the time of the challenged conduct--the statute
of limitations cannot be tolled on this basis.

### 3. Was the Statute of Limitations Tolled by the Doctrine of Fraudulent Concealment?

Where a defendant fraudulently conceals a cause of action
from the plaintiff, the statute of limitation is tolled until
the plaintiff has "actual knowledge" of his cause of action.
*Demoulas*, 677 N.E.2d at 174; Mass. Gen. Laws c. 260, § 12.   The
doctrine of fraudulent concealment "concerns plaintiffs' ability
to know of the 'cause of action' itself, not the particular
identity of the tortfeasor."   *Gauthier* v. *United States*, No. 10-
40116, 2011 WL 3902770, *5 (D. Mass. Sept. 2, 2011) (citing
*White* v. *Peabody Const. Co., Inc.*, 434 N.E.2d 1015 (Mass.
1982)).

When asked to sign an agreement which would have allocated
him only 15% of the royalties from the Pioneering Patents, Dr.
Charest refused and protested the decision.   Am. Compl. ¶ 37-38.
Dr. Charest was informed by OTD that Dr. Myers' share was not
open for discussion.   When Dr. Charest spoke to Dr. Myers about

his outsize allocation, Dr. Charest's overtures were met with threats.  Am. Compl. ¶ 41.  Similarly, Dr. Halvorsen threatened to allocate royalties to another patent on which Dr. Charest was not an inventor and "Dr. Charest understood Dr. Halvorsen to be using the undisclosed patent as leverage over him."  Am. Compl. ¶ 46.  Dr. Charest in fact wrote to Dr. Halvorsen that he (Dr. Halvorsen) "issued the written warning that my portion of the inventor allocation would be reduced if I proceed forward."  *Id.* These facts are the gravamen of Dr. Charest's claims and they were known to him as they occurred.  The allegation of fraud and deceit--that "[i]f Dr. Charest had known the truth about the undisclosed patent application [i.e., that it was without any value], he would never have agreed to a reduction in his share of the Inventor Royalties"--suggests only that Dr. Halvorsen's leverage was weaker than Dr. Charest recognized and that Dr. Charest has come to regret acceding to the demands.

    4.    Conclusion

    At bottom, any claim of tolling fails because the complaint demonstrates that Dr. Charest recognized the harm and wrongfulness of the conduct as it occurred.  He was presented with an agreement that would reduce his share of the royalties, and threatened by Dr. Myers and Dr. Halvorsen if he did not accede to their demands.  Rather than promptly bringing his

claims, he chose not to do so for more than six years, after which time the statute of limitations had run.

I will consequently dismiss Counts I and III-VII to the extent that they depend upon the initial allocation of royalties from the Pioneering Patents, and Count II in its entirety, on statute of limitations grounds.[7]

## C.   *Breach of Contract Claims Based Upon Re-Allocation of Royalties to the Intermediary Patent Turn on the Propriety of the Process Employed in Effecting that Re-Allocation*

Dr. Charest contends that OTD violated the IP Policy in three distinct ways when re-allocating royalties from the Pioneering Patents to the Intermediary Patents.

First, the IP Policy provides a right of appeal of OTD's allocation decisions, allowing an affected individual to appeal "to the Committee on Intellectual Property for final determination." MD Ex. F, § V(F). Dr. Charest contends that Harvard breached this requirement by sending his appeal of OTD's re-allocation decision to an *ad hoc* committee rather than to the Harvard IP Policy Committee and by refusing him the opportunity

---

[7] In addition, because I have determined that no fiduciary relationship is properly alleged between Dr. Myers and Dr. Charest, I will dismiss Count IV in its entirety on that ground as well.

to participate in a meaningful way in the appeals process.  Am. Compl. ¶ 148.

Second, he claims that the IP Policy requires that royalties from the Tetraphase License be allocated between the Pioneering and Intermediary Patents according to the values assigned to those patents by the terms of the license and that Harvard's allocation breached this requirement.  Am. Compl. ¶¶ 145-46.

Third, Dr. Charest claims that, if the license agreement does not place a value upon individual patents, royalties must be allocated according to their commercial value--which Harvard has failed to do.  Am. Compl. ¶ 147.

    1.  <u>Did Harvard Breach the IP Policy in the Handling of Dr. Charest's Appeal?</u>

After being informed of OTD's initial determination that 33% of the royalties from the Tetraphase License should be allocated to the Intermediary Patent, Dr. Charest sought to exercise his right to appeal this determination to the IP Committee--a right provided by Harvard's IP Policy.  MD Ex. F, § V(F).

Dr. Charest alleges a series of irregularities and improprieties in the handling of his appeal to the OTD.  First, Dr. Charest challenges the procedures of his appeal.

Specifically, Dr. Charest alleges that, despite representations
from Harvard that he would have notice of the appeal hearing and
an opportunity to present materials to the IP Committee, he was
not informed of the hearing of his appeal until after it had
been completed, he was given no opportunity to respond to
materials submitted to the committee by OTD, he was not informed
of the substantive positions of adverse parties, and he never
was able to present his substantive arguments to the IP
Committee.  Dr. Myers and OTD, in contrast, were afforded an
opportunity to submit their substantive arguments to the
committee, and two representatives from OTD, Mr. Kohlberg and
Dr. Fenerjian, actually appeared before the committee during the
hearing on Dr. Charest's appeal.

Second, Dr. Charest challenges the constitution of the
committee which heard his appeal.  He claims that OTD directed
his appeal to an *ad hoc* committee convened for the specific
purpose of hearing his appeal, rather than sending the appeal to
the IP Committee, a standing committee appointed by Harvard's
President.

While the IP Policy provides the opportunity for an appeal
of an OTD determination, it does not dictate any specific
procedural formalities that must be followed during such an
appeal.  It does not specify that an appellant will be given

notice of the committee hearing, an opportunity to present substantive evidence to the committee, an opportunity to appear before the panel and present arguments, or an opportunity to be apprised of the arguments of adverse parties.  And Harvard has not promulgated any rules or regulations governing the appeals provided under its IP Policy.  This lack of definition, however, does not mean that Harvard is unfettered in structuring its appeals process.  To have fulfilled its contractual promise, Harvard must provide an appeal process sufficiently robust to be worthy of that term.

In *Hooters of America, Inc.* v. *Phillips*, 173 F.3d 933 (4th Cir. 1999), the Fourth Circuit addressed a circumstance in which the restaurant chain Hooters and its employees agreed to arbitrate disputes "pursuant to the company's rules and procedures . . . as promulgated by the company from time to time." *Hooters*, 173 F.3d at 936.  Pursuant to this provision, Hooters promulgated rules that "when taken as a whole . . . were so one-sided that their only possible purpose is to undermine the neutrality of the proceeding." *Id.* at 938.  The Fourth Circuit held that doing so was a contractual violation, *id.* at 940 ("By creating a sham system unworthy even of the name of arbitration, Hooters completely failed in performing its

contractual duty."), and violated the implied covenant of good faith and fair dealing:

> Hooters had a duty to perform its obligations in good faith . . . Phillips agreed to the prompt and economical resolution of her claims.  She could legitimately expect that arbitration would not entail procedures so wholly one-sided as to present a stacked deck.  Thus we conclude that the Hooters rules also violate the contractual obligation of good faith.

As the Fourth Circuit explained, Hooters and its employees agreed to a contract under which Hooters was obligated to establish an arbitration system and had discretion in fulfilling this obligation.  Hooters' discretion was not unbounded, however.  Hooters could not establish such unfair rules as to make the arbitration process a sham and was required to exercise its discretion in accordance with the covenant of good faith and fair dealing inherent in all contracts.  Here, Harvard was entrusted with contractual discretion to establish the procedures for hearing appeals from the royalty allocation decisions of OTD.  Harvard, like Hooters, is obligated to exercise its contractual discretion in good faith when setting the rules for an appeal to the IP Committee.

Good faith execution of the contractual terms does not require that Harvard meet some Platonic ideal in designing its

appellate procedures.[8]  Nor would it be appropriate for this court to determine the appropriate procedures to govern an appeal to the IP Committee and then attempt to measure Harvard's conduct against that standard.[9]

However, I need not measure Harvard's conduct only against such abstract ideals.  According to Dr. Charest, Harvard made specific procedural promises to him.  Although the

---

[8] Although not precisely applicable here, the Supreme Court's statement that "(d)ue process unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances" but instead "is flexible and calls for such procedural protections as the particular situation demands," *Mathews* v. *Eldridge*, 424 U.S. 319, 334 (1976) (citations omitted), underscores the difficulty of trying to devise in the abstract the procedural requirements Harvard was obligated to provide to fulfil its promise of an appeal under Section V(F) of the IP Policy.

[9] In the somewhat analogous circumstance in which a student has attacked the fairness of a University's disciplinary proceedings, the First Circuit, applying Massachusetts law, has explained that "[w]here, as here, the university specifically provides for a disciplinary hearing before expulsion, we review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules . . . .  We also examine the hearing to ensure that it was conducted with basic fairness." *Cloud* v. *Trustees of Boston University*, 720 F. 2d 721, 724-25 (1st Cir. 1983).  In performing this review of a University's internal decision-making, however, "courts are chary about interfering with academic . . . decisions made by private colleges and universities." *Schaer* v. *Brandeis Univ.*, 735 N.E.2d 373, 381 (Mass. 2000) (citations omitted).

communications were made subsequent to the formation of the
contract, they are reflective of the parties' understanding of
what constitutes a proper appeals process under the IP Policy.
*See Lanier Prof. Servs., Inc.* v. *Ricci*, 192 F.3d 1, 4 (1st Cir.
1999) (describing use of extrinsic evidence to interpret
contractual terms under Massachusetts law).  He alleges that
Harvard represented that he would be given notice of the date of
the hearing of his appeal, that he would be an opportunity to
present his substantive arguments, that he would be given notice
of the substantive positions of adverse parties, and that he
would be given the chance to appear before the tribunal that
would decide his appeal.  Dr. Charest alleges that rather than
making good on these promises, Harvard reneged and instead
presented the outcome of the appeals process to him as a *fait
accompli*.[10]  Arguably, such a proceeding would not constitute an

---

[10] One of Dr. Charest's complaints--though perhaps only a minor
one--is that the committee that heard his appeal was convened by
the Provost of Harvard, rather than the President.  During oral
argument, counsel for Harvard suggested that this deviation was
excused because the Provost was empowered under the IP Policy to
make "amendments and modifications" to it.  The authority to
amend or modify a policy does not entail the authority to
violate the rules.  While the University may have the power to
modify the rules, those rules are generally applicable and must
be enforced as they stand--until they are actually modified.
What Harvard may not do is alter the rules on the fly and on an
*ad hoc* basis to suit its immediate purposes.

48

appeal even without this extrinsic evidence — these are allegations of serious procedural shortcomings — but with that evidence, it is clear that Dr. Charest has alleged a breach of contract.

In the somewhat analogous context of a University disciplinary proceeding, Justice Ireland of the Massachusetts Supreme Judicial Court explained (in dissent, but on this point in it basic agreement with the majority) that: "if the university puts forth rules of procedure to be followed in disciplinary hearings, the university should be legally obligated to follow those rules . . . the university cannot tell its students that certain procedures will be followed and then fail to follow them." *Schaer* v. *Brandeis University*, 735 N.E.2d 373, 383 (Mass. 2000) (Ireland, J., dissenting).  That approach is applicable here.  Dr. Charest has alleged that Harvard promised him an appeals process worthy of the name, and revealed what specific procedures it understood to be owed under the contract, but did not follow through on this promise.  If these allegations are true, Harvard has deprived him of the meaningful and fair hearing it was obligated to provide under Section V(F) of its IP Policy.

> ### 2.   Did OTD Improperly Value the Intermediary Patent?

In addition to claiming that Harvard failed to abide by the

promises it made regarding the procedural handling of his appeal, Dr. Charest also claims that the substantive outcome of that process violated Harvard's IP Policy.

The IP Policy provides that "when an executed license agreement assigns different values to different Creations licensed as a package, that value shall be the value assigned for purposes of allocating Net Royalties among such Creations." MD Ex. F, § V(E)(3).

Nowhere in the License Agreement is there an explicit statement regarding the relative value of the Intermediary and Pioneering Patents or an assessment of their relative value to Tetraphase. Instead, Dr. Charest relies on valuations implicit in the Tetraphase License royalty structure. As discussed above, as consideration for the initial grant of a license to the Pioneering Patents, Tetraphase made an upfront payment of $250,000 to Harvard, along with commitments to make future milestone payments (based upon the progress of commercializing the technology) and royalty payments (based upon sales). *See* Am. Compl. Ex. E, § 6. Although Dr. Charest alleges that the only consideration for the addition of the Intermediary Patent is $25,000, Compl. ¶ 58, a review of the actual amendment, Compl. Ex. D, First Amendment, shows that it says the initial upfront payment is "partial consideration" for the license to

the additional patent.  This is a meaningful distinction because when a new patent is added to a royalty paying license, the licensor's consideration may come in forms other than an upfront payment; if that patent increases the licensee's sales, percentage-based royalties accruing will correspondingly increase as well.  This would constitute additional consideration, not necessarily explicit, that rises or falls with the value of the additional patent.  The $25,000 upfront payment for the addition of the Intermediary Patents to the Tetraphase License cannot appropriately be viewed as an assignation of the relative value of that patent to the license.

For purposes of evaluating Dr. Charest's first alleged species of breach of contract, the relevant question is whether the "license agreement assigns different values to different Creations licensed as a package."  The Tetraphase license agreement does not.  The most Dr. Charest has alleged (and the license itself shows) is that Harvard has received consideration in different forms for the different patents.  This falls short of the explicit assignation of value necessary to trigger the provision of the IP Policy, which requires that the license actually "assign[] . . . values" to different patents.

Alternatively, Dr. Charest contends that, if the license does not assign values to the different patents, OTD was

required to do so in accordance with the commercial value of the patents--and that the allocation determination made by OTD was inconsistent with the commercial value.

The relevant language in the IP Policy provides that: "upon request of any of the Creators, OTD will determine the relative value to the package of each of the Creations."  MD Ex. F, § V(E)(3).  This provision reveals the central failing of Dr. Charest's second species of contract claim.  In the absence of a specification of relative value in the license agreement, the contract does not entitle Dr. Charest to a specific royalty amount or an assessment against a specified benchmark.  Rather, it provides him the right to have OTD make a determination of the relative value of his patent.  And he has undoubtedly received such a determination from OTD in the form of a 33%/66% split which he subsequently appealed.

In his complaint, Dr. Charest sets forth various allegations of facts which would support his view that the value of the Intermediary Patent was relatively minimal and therefore OTD's determination was incorrect.  *See, e.g.,* Compl. ¶¶ 58-63, 89-96.  But Dr. Charest points to nothing that suggests that OTD was obligated to consider the various facts he enumerates in his complaint nor even that he was entitled to some objectively

correct allocation of royalties.[11]  The contractual promise was
procedural, not substantive: that OTD would make a determination
of relative value.[12]  Harvard provided such a determination to
Dr. Charest.

**D.   *Tortious Interference with Contractual Relations***

In support of his claim for tortious interference with
contractual relations, Dr. Charest asserts that Dr. Myers worked
with OTD, Dr. Baker, and Dr. Plamondon to misrepresent the
relative value of the two patents to the "*ad hoc* committee"
hearing the allocation appeal.  Am. Compl. ¶¶ 162-165.  In order

---

[11] This procedural obligation retains a substantive flavor
because OTD must make a determination for "relative *value*"
(emphasis supplied).  The procedure must serve that ultimate
end.  If, for example, OTD held a hearing that allocated
royalties 66%/33% because Dr. Myers was twice as old as Dr.
Charest, or on the roll of a dice, it would have breached its
contractual obligation to determine "value," no matter how many
procedural safeguards were employed.  However, Dr. Charest does
not allege that OTD's hearing ignored value in this way.
Indeed, the Amended Complaint alleges that OTD told Dr. Charest
that its determinations would be based on "value."  Am. Compl.
¶ 66, 84.  As alleged, OTD made a determination of value and
therefore kept its obligation under the IP Policy.

[12] Dr. Charest specifically alleges that "relative value" in the
IP Policy must equate to "commercial value"--picking up on a
phrase used in the letter from OTD informing inventors of the
outcome of Dr. Charest's appeal of OTD's determination.  Am.
Compl. Ex. B.  That may be so, as Massachusetts allows course of
dealings evidence to be used to resolve ambiguous contract
terms.  *See Keating* v. *Stadium Mgmt. Corp.*, 508 N.E.2d 246, 251-
52 (Mass. App. Ct. 1987).  But since the Amended Complaint does
not allege that OTD ignored value, commercial or otherwise, this
is immaterial.

to make out a claim for tortious interference with contractual relations, a plaintiff must allege "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 571 N.E.2d 1363, 1369 (Mass. 1991).

Dr. Charest's allegations fail to state a claim for tortious interference with contractual relations for several reasons.  First, while he alleges that Dr. Myers worked with OTD, Dr. Baker, and Dr. Plamondon to present false information to the *ad hoc* committee, he fails to link these allegedly false statements to any breach of a contractual provision.  Nothing in the IP Policy bars the IP Committee from hearing the views of Dr. Myers, Dr. Plamondon, and OTD.  As discussed above, even if their false submissions led the IP Committee to reach an outcome unfavorable to Dr. Charest, that does not constitute a breach of contract; the IP Policy does not guarantee to Dr. Charest any substantive outcome.[13]

---

[13] To be clear, a lower allocation to the Pioneering Patent may be the harm resulting from some alleged breach of contract.  But the substantive fact of a lower allocation does not constitute a breach of any contractual provision.

Second, to state a claim, the alleged interference must be
"improper in motive or means."  The Massachusetts Supreme
Judicial Court has explained that "for example . . . a party is
justified in interfering with a third-party's contract with
another by filing a lawsuit in a good faith effort to assert
legally protected rights" but that this conduct would be
malicious if the initiator "does not have probable cause to
believe the suit will succeed, and is acting primarily for a
purpose other than that of properly adjudicating his claims."
*G.S. Enterprises*, 571 N.E.2d at 1370.  Here, Dr. Charest has
initiated a proceeding--the appeal to the IP Committee--that is
in some ways akin to a lawsuit.  Dr. Myers, as an individual
with a stake in the process, undoubtedly has the right to
participate in the appeal.  In doing so, Dr. Myers' conduct is
protected by something akin to the "litigation privilege."
*Cf. Loltek-Jick* v. *O'Toole*, 29 Mass. L. Rptr. 269 (Mass. Super.
Ct. 2011) (applying privilege to arbitration as well as
litigation).  That privilege provides that statements by a
party, counsel or witness in the institution of, or during the
course of, a judicial proceeding are absolutely privileged so
long as such statements relate to that proceeding.  *Sriberg* v.
*Raymond*, 345 N.E.2d 882, 883 (Mass. 1976).  This privilege
applies not only to claims of defamation and slander, but also

to other torts, including claims of intentional interference
with contractual relations.  *See, e.g., Blanchette* v. *Cataldo*,
734 F.2d 869, 877 (1st Cir. 1984).  Dr. Charest alleges that Dr.
Myers and other participants made false statements regarding the
relative value of the Pioneering and Intermediary Patents to the
IP Committee during the hearing of Dr. Charest's appeal.  It is
imperative for the functioning of such a process that
participants be free to express their opinions and advocate for
their viewpoint without fear of legal liability.  The
allegations set forth by Dr. Charest do not show that Dr. Myers'
participation in the appeal was "improper in motive or means."
To the contrary, this participation was the exercise of a
protected right--the right to participate freely in litigation
affecting one's interests.[14]

     Third, resolving Dr. Charest's claim of tortious
interference would require a finder of fact to determine whether
Dr. Myers falsely represented the value of the Intermediary
Patent, as Dr. Charest has alleged.  That determination,
however, is vested in the IP Committee and it is for that

---

[14] If Dr. Charest alleged that Dr. Myers had interfered with the
contract by causing the appeal to be unfair in its very
constitution, for example by convening a prejudiced tribunal in
the first place, this privilege might not apply.  But Dr.
Charest only alleges that Dr. Myers interfered through his
communications with the committee.

committee, not for this court, to determine the appropriate relative values of the patents.  For the court to make that determination would be an unwarranted interference in a decision that the contractual arrangements among the parties has reserved to the IP Committee.

## E.  *Promissory Estoppel*

In his promissory estoppel claim, Dr. Charest simply seeks to enforce the terms of the IP Policy as a promise made by Harvard to induce Dr. Charest to assign the Pioneering Patents to Harvard.  Under Massachusetts law, the doctrine of promissory estoppel is implicated only in "the absence of an express contract." *Northrup* v. *Brigham*, 826 N.E.2d 239, 244 (Mass. App. Ct. 2005).  Because I have already determined that the IP Policy is a contract binding upon Harvard, promissory estoppel is inapplicable here.

## F.  *Violation of Chapter 93A*

Although Dr. Charest alleges a litany of conduct which he contends constitutes a claim under Massachusetts General Law Chapter 93A, *see* Compl. ¶¶ 180-191, the allegations boil down to essentially three instances of conduct.

The first, discussed above, is that surrounding the initial allocation of royalties among the inventors of the Pioneering Patents.  And, as discussed above, claims relating to those

events are untimely and barred by the statute of limitations and
will be dismissed.

The second instance of conduct is OTD's decision to re-
allocate royalties to the Intermediary Patent and then, when Dr.
Charest challenged this determination, engineering the appeal
process to favor Harvard's faculty member and punish Dr. Charest
for exercising his contractual right of appeal.  According to
Dr. Charest, OTD threatened that his allocation would be further
reduced if he challenged its allocation decision, and followed
through on this threat by diverting the appeal from the IP
Committee to a committee selected to be favorable to Dr. Myers
and OTD and by preventing Dr. Charest from having meaningful
involvement in the appeal.

These allegations concern the internal governance
procedures of Harvard University for allocating royalties
arising from patented inventions developed jointly by multiple
researchers working at Harvard University and the relationship
between Dr. Charest and Harvard from which these allegations
arise is akin to that of an employee and an employer.  Chapter
93A is inapplicable to disputes that are private and concern the
internal governance of an entity.  *See, e.g., Zimmerman* v.
*Bogoff*, 524 N.E.2d 849, 856 (Mass. 1988) ("The transactions at
issue here were principally private in nature and thus do not

fall within the purview of G.L. c. 93A."); *Riseman* v. *Orion Research, Inc.*, 475 N.E.2d 398, 400 (1985) (Chapter 93A is inapplicable in a case involving "the internal governance of a corporation."); *Manning* v. *Zuckerman*, 444 N.E.2d 1262, 1265 (Mass. 1983) ("[E]mployment agreements between an employee and the organization of which he is a member do not constitute 'trade' or 'commerce.'").

The third alleged instance of conduct arose after the IP Committee rendered its decision regarding Dr. Charest's appeal of OTD's initial allocation.  Since that decision, until the onset of this lawsuit, Harvard refused to pay to Dr. Charest any of the royalties owed to him according to the IP Committee's decision unless and until Dr. Charest signed a release accepting the committee's decision and releasing Harvard from any liability for its conduct.

In its February 3, 2014 brief regarding these events, Harvard explained that the OTD made payments to all inventors until they became aware that Dr. Charest sought to appeal the royalty allocation decision.  At that time, they suspended all payments to all inventors.  After the IP Committee rendered its decision, OTD informed the inventors of the decision and requested "a signed acknowledgment--*not* a release of claims-- upon receipt of which OTD would distribute each inventor's

respective share of the royalties." According to Harvard, this
release is important because once Harvard makes royalty payments
to an inventor, it is their long-standing practice not to seek
recoupment of overpayments. Rather, in the case of a
misallocation, Harvard makes the underpayee whole out of its own
funds. The acknowledgment of the IP Committee's decision
mitigates Harvard's risk of making such overpayments which it
will later be required to cover. With the exception of Dr.
Charest, all of the inventors returned the requested
acknowledgment and received their royalty payments.

I find several problems with Harvard's explanation of its
conduct. First, while Harvard claims that it requested only an
"acknowledgment" as a condition of releasing funds, the
subsequent letter provided by the plaintiff appears to show that
Harvard was holding Dr. Charest's funds in escrow and that "an
appropriate release of claims would . . . be required" as a
condition of the release of those funds to Dr. Charest--directly
contradicting Harvard's representations to this court. Second,
while Harvard represented in its latest brief that it suspended
payment of all royalties to all inventors upon receiving notice
of Dr. Charest's appeal, in an earlier brief submitted to this
court, the defendants stated: "Dr. Myers received his 50% share
of the first royalty payment in January 2008 and 50% of every

60

other royalty payment to the Intermediate Method Patent since that time"--a statement which seems to suggest that Dr. Myers received his payments without interruption from 2008 until the present.  It would appear strikingly unfair if Harvard continued to make payments to its own faculty members while suspending payments to unaffiliated (or only formerly affiliated) scientists when the relevant contract provided no greater priority to Dr. Myers than to Dr. Charest.  Third, at the core, Harvard's representations simply reaffirm Dr. Charest's allegations, albeit with some context provided.  Dr. Charest stood on contractually equal footing with his co-inventors on the Pioneering Patents--each had the same contractual rights to payments from the royalty streams (although in different percentages).  Those who signed and return the requested forms from Harvard (whether termed an acknowledgment or release), received disbursements of funds.  Dr. Charest did not sign and return the forms requested by Harvard and Harvard, in turn, refused to release funds held in escrow to him.  Yet nothing in the contractual arrangements between Harvard and Dr. Charest--or Harvard and the co-inventors--made signing these forms a valid precondition to the disbursement of funds or otherwise justified this differential treatment.  This was a unilateral decision by

Harvard that it was able to effect because it controlled the monies flowing from the Tetraphase License.

Unlike the allegations regarding OTD's conduct and the IP Committee's allocation decisions, the Chapter 93A claim relating to Harvard's withholding of monies may not be dismissed as arising purely from a private matter of Harvard's internal governance.  At the time that the funds were withheld, Dr. Charest was no longer associated with Harvard in a business venture and the internal governance procedures necessary for the disbursement of funds had concluded.  As Harvard explained in its March 1, 2011 letter, "[a]ll appeal rights under the IP Policy have now been finally and completely exhausted."  At that point, the only then-existing relationship between Harvard and Dr. Charest was that Harvard had contractual obligations to pay-over money received from the Tetraphase License.[15]  Dr. Charest had no relationship with Harvard nor with Tetraphase after the completion of the IP appeal.  At least at the stage of a motion to dismiss, I cannot conclude that this is anything other than a

---

[15] Harvard's argument that Dr. Charest's statement that he and the IP Committee are both a part of the "Harvard community" makes them all members of a joint enterprise is hardly compelling; it is tantamount to a contention that no Harvard alum may sue another under Chapter 93A because every alum is a member of the "Harvard community."

commercial relationship--little more than that of creditor and
debtor--and not a joint enterprise.

The remaining question is whether the conduct alleged by
Dr. Charest is of the sort outlawed by Chapter 93A.  Chapter 93A
makes unlawful "unfair methods of competition and unfair or
deceptive acts or practices in the conduct of any trade or
commerce."  Mass. Gen. Laws. c. 93A, § 2.  While the standard
for a violation of Chapter 93A has sometimes been described in
uninstructive terms, such as whether the conduct has "attain[ed]
a level of rascality that would raise an eyebrow of someone
inured to the rough and tumble of the world of commerce,"
*Levings* v. *Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass.
1979), Massachusetts courts have specifically identified certain
conduct that violates Chapter 93A.  In particular, the Supreme
Judicial Court has said that conduct "in disregard of known
contractual arrangements and intended to secure benefits for the
breaching party constitutes an unfair act or practice for c. 93A
purposes," *Anthony's Pier Four*, 583 N.E.2d at 475 (citing *Wang
Labs., Inc.* v. *Business Incentives, Inc.*, 444 N.E.2d 1262 (Mass.
1986)), and the First Circuit has explained Chapter 93A makes it
unlawful for a party to withhold "monies which they legally owed
as a form of extortion — to force [the plaintiff] to do what
otherwise it could not be legally required to do."  *Pepsi-Cola*

63

*Metro. Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 17-19 (1st Cir. 1985).  Dr. Charest has alleged that Harvard and OTD has done precisely this.  While knowing that royalties are owed to Dr. Charest and while paying royalties to other similarly situated inventors, Harvard has withheld royalties from Dr. Charest until and unless he signs various forms acknowledging acceptance of Harvard's decision and executes releases of liability--acts which he has no contractual or other legal obligation to perform.

Adding to the unfair quality of the alleged is the obvious inequality between the parties, not only in terms of institutional size and authority, but also in terms of the contractual structure.  With the Participation Agreement and IP Policy, Harvard has created a mechanism for the licensing and commercialization of the inventions developed by its faculty and students.  While presenting significant benefits to inventors, this mechanism vests authority and discretion in OTD in terms of structuring licensing agreements, valuing inventions, and, as relevant here, collecting and distributing royalties.  Dr. Charest's allegations suggest that OTD abused this authority-- engaging in what the defendants aptly, if disapprovingly, describe as an allegation of a "grand conspiracy"--which hindered and punished Dr. Charest for the exercise of his

64

contractual rights by refusing to pay amounts owed to him. While it may be that evidence developed during discovery will show that Harvard and OTD's conduct has been proper and forthright, Dr. Charest's allegations suggest otherwise.

### IV. CONCLUSION

For the reasons set forth more fully above, I will grant Defendants' Motion to Dismiss (Dkt. No. 11) as to Claims II-VI. I will also GRANT Defendants' Motion to Dismiss Claim I to the extent that those claims relate to the initial allocation of royalties among the inventors of the Pioneering Patents. I will also GRANT Defendants' Motion to Dismiss Claim VII to the extent that those claims relate to the initial allocation of royalties among the inventors of the Pioneering Patents. The Defendants' Motion to Dismiss is DENIED as to Claim I, as it relates to Defendants' failure to provide, procedurally, the appeals process promised. The Motion to Dismiss is DENIED as to Claim VII, as it relates to Defendants' withholding of monies owed.

In addition, because I have dismissed all of the claims against Dr. Myers, he is dismissed from the case as a defendant.

It is FURTHER ORDERED that that the parties shall file on
or before March 4, 2016 a joint scheduling submission outlining
a proposal for bringing this case to final judgment.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE